*558 OPINION OF THE COURT
Stuart C. Cohen, J.
This is an action for defamation brought by Bernhard Goetz. Defendants move for summary judgment dismissing the complaint.
FACTS
The underlying facts are not in dispute. On or about September 1, 1994, defendant Carol Communications, Inc., published an autobiography entitled "My Life as a Radical Lawyer” by William M. Kunstler, one of this country’s well-known lawyers.
The book is a retrospective of Kunstler’s public life as a lawyer. In his own words, Kunstler discusses his headline-making clients and their cases, from the defendants in the Chicago Seven trial through the conspiracy case against members of an Islamic group who sought to blow up New York City landmarks and assassinate public officials. Kunstler describes his transformation from a lawyer who once represented civil rights workers and antiwar protesters to a lawyer now willing to take on the most inflammatory of cases and the most unpopular of clients.
In chapter 15, "Defending Blacks in a Racist Country”, Kunstler discusses some of the African-American clients he has represented throughout his career. These include James Dixon York and Anthony La Borde, former Black Panthers accused of killing two New York City police officers; Wayne Williams, the convicted killer in the Atlanta child murder case; Larry Davis, who was charged with the attempted murder of six police officers; Alcee Hastings, an impeached Federal Judge; Yusef Salaam, one of the youths charged with raping the Central Park jogger; and Washington, D.C. Mayor Marion Barry.
Kunstler tells these clients’ stories and discusses his personal philosophy that racial prejudice against African-Americans is pervasive throughout American society. Set against this backdrop, Kunstler discusses another of his African-American clients, Darrell Cabey. In a four-paragraph passage, Kunstler makes statements about Bernhard Goetz that are the basis of this defamation action. He writes:
"On a crowded subway train a few days before Christmas, 1984, four black kids aggressively panhandled Bernhard Goetz *559 for five dollars, and he pulled out a gun and shot them. He was immediately hailed as a hero, while the four kids, falsely reported to be armed with sharpened screwdrivers, were labeled as evil wrongdoers. As it turned out, the kids had not been armed, and Goetz was nothing more than a murderous vigilante. What if the kids has been white? I’m certain that Goetz would have been condemned by the same people who so quickly rushed to praise him.
"Goetz shot those four youths because he is paranoid and has venomous feelings against black people. As he said publicly, he had been mugged previously and had developed a hatred toward all blacks. In 1986, he was convicted of weapons possession rather than attempted murder because the white public still viewed him as a hero, and he served a reduced sentence of six months.
"A year earlier, in 1985, I had been contacted by Shirley Cabey, whose son, Darrell, was one of Goetz’s victims. She wanted to sue Goetz because, as a result of the shooting, her son was paralyzed and would never walk again. Also, the Cabey family had incurred enormous medical expenses and needed help to pay the bills. Along with Ron, I brought a $50 million lawsuit and felt confident that we would eventually win because of what Goetz had admitted to police in Concord, New Hampshire, where he fled after the shootings. He told them that, after he shot Darrell and the others, he walked up to Darrell as he lay wounded on the seat of the subway car and said, 'You seem to be all right. Here’s another.’ Goetz then shot him again, and it was apparently this second bullet that had severed Darrell’s spinal column.
"Goetz admitted this when we took his deposition for the Cabey family’s lawsuit. I asked, 'Did you say these things to Darrell?’ and he said, 'Yes.’ When we gave this information to the press, he lost much of his widespread support in the white community. Ron and I have also filed a claim on Darrell’s behalf with the Crime Victims Board which is still pending, as is the lawsuit. Meanwhile, our client spends his days in a wheelchair in his family’s apartment, watching television, another victim of the cancer of racism.”
CONTENTIONS
As a result of these remarks, Goetz commenced this action against Kunstler and Carol Communications, Inc., seeking damages for "certain false, scandalous, malicious and defama *560 tory statements” made about him in the book. Specifically, Goetz complains that defendants describe him as a "murderous vigilante”; as being "paranoid”; as having "venomous feelings against black people”; as having "developed a hatred toward all blacks”; as having "served a reduced sentence of six months”; as having shot Darrell Cabey with a "second bullet that severed Darrell’s spinal column”; as having "lost much of his widespread support in the white community”; and as having falsely stated that "Ron and I have also filed a claim on Darrell’s behalf with the Crime Victims Board which is still pending.”
Goetz also claims that defendants allowed these statements to be published "knowing they were not true, and did so with actual malice and ill-will toward the plaintiff, and for the expressed purpose of injuring the plaintiff’s good name, reputation, feelings and public standing, exposing him to public ridicule and loss of esteem in the minds of a substantial number of persons in the community.”
Defendants move herein for summary judgment dismissing the complaint on the ground that the statements complained of are nonactionable under the defense of truth, that the statements are constitutionally protected expressions of opinion and that the statements are not defamatory.
DISCUSSION
In the landmark defamation case New York Times Co. v Sullivan (376 US 254), the Supreme Court took note of the "profound national commitment to the principle that debate on public issues should be uninhibited, robust and wide-open, and that it may well include vehement, caustic and sometimes unpleasantly sharp attacks on government and public officials.” (376 US, at 270.)
The Court ruled that the First Amendment permits a public official to recover damages for a defamatory falsehood only if he can show that the defamatory publication was not only false, but was uttered with "actual malice — that is, with knowledge that it was false or with reckless disregard of whether it was false or not.” (Supra, at 280.)
In Curtis Pub. Co. v Butts (388 US 130), the Court determined that the New York Times v Sullivan test should apply to criticism of public figures as well as public officials. The Court extended the constitutional privilege announced in that case to protect defamatory criticism of nonpublic persons who *561 are nevertheless intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large (388 US, at 155, supra). As Chief Justice Warren noted in concurrence, "Our citizenry has a legitimate and substantial interest in the conduct of such persons, and freedom of the press to engage in uninhibited debate about their involvement in public issues and events is as crucial as it is in the case of 'public officials’ ” (supra, at 164).
Bernhard Goetz concedes that he is a public figure.
The free speech provision of the New York State Constitution is broader than the Federal Constitution. This State has long provided a hospitable climate for the free exchange of ideas, and this tradition is embodied in the free speech guarantee of the New York State Constitution, which provides that "[e]very citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right” (NY Const, art I, § 8). These words, unchanged since the adoption of the constitutional provision in 1821, reflect the deliberate choice of the New York State Constitutional Convention not to follow the language of the First Amendment, ratified 30 years earlier, but to set forth our basic democratic ideal of liberty of the press in strong affirmative terms (Immuno AG. v Moor-Jankowski, 77 NY2d 235, 249).
Both State and Federal defamation law have recognized a distinction between expressions of opinion, which are not actionable, and assertions of fact, which may form the basis of a viable defamation claim. The dispositive inquiry is whether a reasonable reader could have concluded that the challenged statements were conveying facts about the plaintiff (Immuno AG. v Moor-Jankowski, supra, at 254; Gross v New York Times Co., 82 NY2d 146, 152; 600 W. 115th St. Corp. v Von Gutfeld, 80 NY2d 130, 139). This is an issue of law to be determined by the court upon an examination of various factors including whether the specific language in issue has a precise meaning which is readily understood, whether the statements are capable of being proven true or false, and whether either the full context of the communication in which the statement appears, its tone and apparent purpose or the broader social context and surrounding circumstances are such as to signal readers or listeners that what is being read or heard is likely to be opinion, not fact (Gross v New York Times Co., supra, at 153; Immuno AG. v Moor-Jankowski, supra, at 254).
*562 Furthermore, in determining whether a particular communication is actionable, courts continue to recognize the distinction between a statement of opinion that implies a basis in fact which is not disclosed to the reader or listener and a statement of opinion that is accompanied by a recitation of the facts on which it is based or one that does not imply the existence of undisclosed underlying facts. The former are actionable because a reasonable listener or reader would infer that the speaker or writer knows certain facts, unknown to the audience which support the opinion and are detrimental to the person toward whom the communication was directed. In contrast, the latter are not actionable because a proffered hypothesis that is offered after a full recitation of the facts is readily understood by the audience to be conjecture (Gross v New York Times Co., supra, at 153-154).
Viewed in this framework, the statements complained of are constitutionally protected opinion.
The context of the work is an autobiography by one of the most controversial members of the Bar — a self-described "radical lawyer”. A reasonable reader of this book would realize that Mr. Kunstler was voicing a personal point of view. Mr. Kunstler also specifically sets forth his representation of Darrell Cabey in a civil suit against Bernhard Goetz, thereby making his affiliation clear and signalling to the reasonable reader that what is said is most likely to be impassioned advocacy.
Additionally, the statements at issue are contained in a chapter in which Kunstler makes many provocative statements of how the justice system is racist. For instance, referring to the New York State Court of Appeals decision upholding Yusef Salaam’s confession in the Central Park jogger case, Kunstler states "I am not surprised at the Court of Appeals’ decision, because the Court’s role is to maintain the social order; keeping Yusef, and as many blacks as possible, in prison is part of the function of the judiciary” (My Life as a Radical Lawyer, at 305).
Kunstler comments on why prosecutors in the Atlanta child murder case did not arrest any Ku Klux Klan suspects, stating "The authorities chose the safer route of finding a black scapegoat and pinning the murders on him.” (Id., at 295.)
In another case, he states that "When any police officer or prison guard is charged with crime, the ranks close to form a *563 thin blue line with one goal: to protect their own. Better to let a black man, a convicted killer, take the rap. Even if, in this case, the rap was death.” (Id., at 291.)
Referring to the cases against Marion Barry and Alcee Hastings, he states that "Blacks who become elected or appointed officials often become victims of witchhunts, the focus of criminal and other charges, in order to strip them of their power.” (Id., at 302.)
And that, "The powerful white establishment uses federal or state prosecutors to carry out stings like the one that trapped Marion. Not surprisingly, most chief prosecutors are white.” (Id., at 310.)
The content, tone and apparent purpose of these statements would be a signal to the reasonable reader, as if a giant flag were raised, that what is being read in this chapter is likely to be an opinion — a biased point of view of an activist lawyer— rather than objective fact.
It is also significant that Kunstler discloses to the reader the facts upon which his opinions are based. He sets forth Goetz’ shooting of four youths on a subway train in December 1984, an incident that was reported nationwide and which generated widespread discussion, controversy and debate. Therefore, his description of Goetz as a "murderous vigilante” would be understood as an opinion, a mere hypothesis based upon facts both widely known and fully set forth. The reader clearly has the opportunity to assess the basis upon which this opinion was reached and draw his own conclusions concerning its validity.
Additionally, Kunstler’s description of Goetz as "paranoid” when construed in the context of the underlying passage and its tenor, and the recited facts of the subway shooting, cannot be understood by the mind of the ordinary intelligent reader as imputing to Goetz an actual physiological or mental affliction (O’Brien v Lerman, 117 AD2d 658, 659; see also, Fram v Yellow Cab Co., 380 F Supp 1314, 1329 [WD Pa]; Capps v Watts, 271 SC 276, 246 SE2d 606, 609; Blouin v Anton, 139 Vt 618, 621, 431 A2d 489, 490). Furthermore, even if the word "paranoid” was considered actionable, Goetz would not be able to recover because he failed to allege any special damages (Moore v Francis, 121 NY 199).
The statements that Goetz has "venomous feelings against black people” and "developed hatred towards all blacks”, while not based upon any disclosed facts are nonetheless *564 protected because the tone of the chapter in which the statements are contained and Mr. Kunstler’s bias would signal to the reasonable reader that what is stated is a matter of opinion. The autobiography in general and the statements about Goetz in particular are written from a subjective, rather obvious, point of view and do not purport to be anything else. Furthermore, speculations as to Goetz’ motives for doing what he did are not readily verifiable and are therefore intrinsically unsuited as a foundation for defamation (see, Rinaldi v Holt, Rinehart & Winston, 42 NY2d 369, 382).
It must also be noted that defendants submit evidence that before the shooting, Goetz stated "[T]he only way we’re going to clean up this street is to get rid of the spies and niggers.”
Goetz states that he made this "insensitive and childish remark” at a time he was "still angry with having been the victim of a vicious mugging” (Goetz affidavit, para 31). Nevertheless, by using these racial epithets, which are considered venomous and offensive to most people, Goetz cannot claim that he is defamed by statements that he developed a hatred toward black people or has venomous feelings against black people. In New York, truth is a complete defense to an action for defamation, regardless of the harm done by the statements (Jung Hee Lee Han v State of New York, 186 AD2d 536).
The other statements of which Goetz complains are not defamatory.
Any written or printed article is actionable without alleging special damages if it tends to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society (Rinaldi v Holt, Rinehart & Winston, 42 NY2d, at 379, supra).
The statement that Goetz "served a reduced sentence of six months” when he actually served a sentence of more than eight months does not diminish his reputation. Similarly, the statement that Goetz shot Darrell Cabey with a "second bullet that severed Darrell’s spinal column” is not defamatory because Goetz admitted to shooting Cabey twice and one of the bullets did, in fact, sever Cabey’s spinal column. It is frivolous to argue that Goetz’ reputation is diminished because Kunstler incorrectly stated that the second bullet, rather than the first, severed Cabey’s spinal column.
Nor does it expose Goetz to public contempt or ridicule to say that the claim with the Crime Victims Board is still *565 pending. Although the claim filed on behalf of Cabey with the Crime Victims Board was denied on February 7, 1989, a CPLR article 78 proceeding to review the denial is still pending.
Finally, it is not defamatory to say that "Goetz lost much of his widespread support in the white community”. The statement does not expose Goetz to contempt, ridicule or aversion. Rather, it is a measure of the esteem in which he is now held.
CONCLUSION
Kunstler’s autobiography is closely related in spirit to the "marketplace of ideas” and values that compelled recognition of the privileges of fair comment, fair report and the immunity accorded expression of opinion. These values are best effectuated by according defendants latitude to publish Kunstler’s statements free of defamation litigation, especially on widely debated matters of public concern where the author’s affiliation, bias and premises are fully disclosed. It is a paramount interest of a free society to assure that open and spirited discussion of matters of public concern will not be chilled by the threat of litigation. Mr. Goetz, as a public figure, is not deprived of a remedy. He can use any available opportunities, outside of litigation, to contradict any lie or correct any error and thereby minimize its adverse impact on his reputation (600 W. 115th St. Corp. v Von Gutfeld, 80 NY2d, supra, at 138).
Accordingly, the motion is granted and the complaint dismissed.