Gennifer **FLOWERS**, Plaintiff–Appellant,

v.

James **CARVILLE**; **Hillary Rodham Clinton**; **Little, Brown & Co.**; **George Stephanopoulos**, Defendants–Appellees.

No. 00–17299.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 14, 2002.

Filed Nov. 12, 2002.

Larry Klayman, Esq., of Judicial Watch, Inc., argued for the appellant.

Laura R. Handman of Davis Wright Tremaine LLP argued for appellees George Stephanopoulos and Little, Brown & Co. Matthew A. Leish joined her on the brief.

David E. Kendall of Williams & Connolly LLP argued for appellee Hillary Rodham Clinton. Nicole K. Seligman and Gabriel E. Gore joined him on the brief.

William Alden McDaniel, Jr. of McDaniel Bennett & Griffin argued for appellee James Carville. Jo C. Bennett joined him on the brief.

Before: WALLACE, KOZINSKI and PAEZ, Circuit Judges.

## OPINION

KOZINSKI, Circuit Judge. ˙

Long after the public spotlight has moved on in search of fresh intrigue, the lawyers remain. And so we find ourselves adjudicating a decade-old dispute between Gennifer Flowers and what she affectionately refers to as the "Clinton smear machine": James Carville, George Stephanopoulos and Hillary Clinton. Flowers charges that said machine destroyed her reputation by painting her as a fraud and a liar after she disclosed her affair with Bill Clinton. We decide whether Flowers's claims are timely and, if so, whether they survive a motion to dismiss.

## Background and Proceedings Below

In the heat of the 1992 presidential primary campaign, the *Star*—that ubiquitous supermarket source for celebrity scandal— ran a story claiming that Bill Clinton had carried on an affair with an Arkansas woman named Gennifer Flowers. Clinton and Flowers both denied it at first, but a few days later Flowers (doubtless realizing that honesty is the best policy after all) sold her story to the *Star*. Clinton continued vigorously denying the allegations and appeared on *60 Minutes* with his wife to say they weren't true. The following day, Flowers responded by holding a press conference where she played recordings of intimate phone calls from Clinton that she'd secretly taped. Later news reports suggested that the tapes may have been selectively edited.

According to Flowers, Hillary Clinton and her two "henchmen," George Stephanopoulos and James Carville, conspired to protect Bill Clinton's presidential candidacy from Flowers's damaging revelations. Flowers claims that during the 1992 campaign and in later political memoirs and interviews, Carville and Stephanopoulos defamed her and painted her in a false light by claiming that she had lied in her story to the *Star* and "doctored" the tape-recorded phone calls. Hillary Clinton, the alleged mastermind of the conspiracy, not only orchestrated the defamatory exploits, but also exposed private information about Flowers and organized break-ins of her residence. Flowers claims that, as a result of all this schemery, her reputation has wilted and her blossoming career as a Las Vegas lounge singer has been nipped in the bud.

Flowers filed this diversity suit in November 1999 in the United States District Court in Nevada, naming James Carville, George Stephanopoulos and Little, Brown & Co. (Stephanopoulos's publisher) as defendants. In January 2000, she added the claims against Hillary Clinton. The defendants moved to dismiss, while Flowers twice again sought to amend her complaint to allege special damages and to claim another instance of defamation by Stephanopoulos.

The district court granted all three motions to dismiss and denied Flowers's requests to amend her complaint. *Flowers v. Carville*, 112 F.Supp.2d 1202, 1214 (D.Nev.2000). The court held that most of Flowers's allegations are time-barred. *Id.* at 1208–10, 1213. It rejected the surviving claims on the merits, holding that some of the statements are merely rhetorical hy-

perbole and others are opinions based on earlier news reports. *Id.* at 1210–12. It dismissed the false light claims as duplicative of the defamation claims, threw out the charges against Clinton as time-barred and impermissibly vague and rejected the conspiracy claim because, with everything else dismissed, there was nothing left to conspire about. *Id.* at 1212–14. Naturally, Flowers appeals.

### Timeliness

1. We must first determine which state's statute of limitations applies. It matters because the statute of limitations for defamation in Nevada is two years, Nev.Rev.Stat. 11.190(4)(c), while the statute in other potentially relevant states is only one. Some of Flowers's claims are only timely under Nevada's longer limitations period; for example, Stephanopoulos made allegedly defamatory remarks in a Larry King Live interview broadcast more than one year, but less than two years, before Flowers filed suit.

■ Because this is a diversity case, forum state law determines which state's statute of limitations governs. *Guaranty Trust Co. v. York*, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945); *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Traditionally, states applied their own statutes of limitations even if the offending conduct happened elsewhere. *See Sun Oil Co. v. Wortman*, 486 U.S. 717, 724–25, 108 S.Ct. 2117, 100 L.Ed.2d 743 (1988). This created opportunities for forum shopping by allowing citizens of states with shorter limitations periods to sue in states with longer periods. In response to this and other concerns, many states have passed "borrowing statutes" that instruct their courts to apply foreign statutes of limitations in

certain cases. *See* John W. Ester, *Borrowing Statutes of Limitation and Conflict of Laws*, 15 U. Fla. L.Rev. 33, 40–41 (1962). Nevada's borrowing statute reads as follows:

> When a cause of action has arisen in another state, or in a foreign country, and by the laws thereof an action thereon cannot there be maintained against a person by reason of the lapse of time, an action thereon shall not be maintained against him in this state, *except in favor of a citizen thereof who has held the cause of action from the time it accrued.*

Nev.Rev.Stat. 11.020 (emphasis added).

■ The district court held that the borrowing statute applies to Flowers because her claim arose elsewhere and she doesn't qualify for the statute's exemption (emphasized above). Flowers held her cause of action from the time it accrued (i.e., the time of defamation),[1] and she was a citizen of Nevada when she sued. But she was not a citizen of Nevada at the time of defamation—she moved there a year before filing suit. *Flowers*, 112 F.Supp.2d at 1209. Although the exemption to Nevada's borrowing statute has been on the books since at least 1869, *see Lewis v. Hyams*, 26 Nev. 68, 82, 63 P. 126 (1900), no published decision has addressed whether it applies to someone who was not a citizen when the claim accrued but became a citizen before filing suit. The district court held that it does not, but we are unable to agree.

The first problem is syntactic. The statute allows a suit to be "maintained … in favor of a citizen [of Nevada] who has held the cause of action from the time it accrued." If the statute simply allowed any suit "maintained … in favor of a citizen [of Nevada]," it could only reasonably mean a citizen at the time the suit is

---

1. The requirement that the plaintiff have held the cause of action since it accrued prevents foreigners from evading the citizenship re-

quirement by assigning their claims to Nevada citizens. *Cf., e.g., Lewis v. Hyams*, 26 Nev. 68, 84 (1900) (on rehearing).

maintained, that is, when the plaintiff files suit. Adding the relative pronoun clause "who has held the cause of action from the time it accrued" doesn't change the timing or duration of the citizenship requirement; it merely imposes an independent limitation on who can take advantage of the exemption.

Even if the district court's reading were plausible as a matter of syntax, it would still violate the last-antecedent rule. *See Reynolds Elec. & Eng'g Co. v. State*, 113 Nev. 71, 930 P.2d 746, 747–48 (1997); *Thompsen v. Hancock*, 49 Nev. 336, 245 P. 941, 942 (1926). Under the district court's interpretation, "from the time it accrued" modifies not just "has held the cause of action," but the entire phrase "citizen [of Nevada] who has held the cause of action." This is precisely the sort of telescopic interpretation that the last-antecedent rule disfavors: words leaping across stretches of text, defying the laws of both gravity and grammar.

Our interpretation is reinforced by a comparison of Nevada's borrowing statute with those of neighboring states. Nevada's statute exempts suits in favor of "a

citizen [of Nevada] who has held the cause of action from the time it accrued." Statutes in California, Idaho and Utah, in contrast, exempt suits in favor of "one *who has been a citizen* of this state and who has held the cause of action from the time it accrued." Cal.Civ.Proc.Code § 361; Idaho Code § 5–239; Utah Code Ann. § 78–12–45 (emphasis added to each; variation in capitalization omitted).[2] In these statutes, the citizenship requirement is set off in a separate clause introduced by "has been." This makes a difference. "Has been" connotes either a continuing status held over some period of time or one held at some point in the past, not one held merely at the moment of filing. Not surprisingly, then, these statutes have been interpreted to require that the plaintiff be a citizen at the time his claim accrued. *Biewend v. Biewend*, 17 Cal.2d 108, 109 P.2d 701, 705–06 (1941); *Miller v. Stauffer Chem. Co.*, 99 Idaho 299, 581 P.2d 345, 346–47 (1978); *Allen v. Greyhound Lines, Inc.*, 583 P.2d 613, 615 (Utah 1978). The omission of the "has been" from the Nevada statute—leaving the citizenship requirement in the present tense—supports a contrary construction.[3]

**2.** California's version includes a comma after the word "state," as did Idaho's at one time. *See Miller v. Stauffer Chem. Co.*, 99 Idaho 299, 581 P.2d 345, 347 n. 6 (1978) (telling the tale of the "fugitive comma").

**3.** Nevada's statute is atypical in this regard. Professor Ester identified twelve borrowing statutes with specific exemptions for citizen or resident plaintiffs. *See* Ester, *supra*, at 80. Of these, nine (including the statutes in California, Idaho and Utah) refer to status at some time other than the moment of filing suit. In addition to the three statutes quoted above, see Del.Code Ann. tit. 10, § 8121 ("[w]here the cause of action originally accrued in favor of a person who at the time of such accrual was a resident"); N.Y. C.P.L.R. § 202 ("where the cause of action accrued in favor of a resident of the state"); N.C. Gen. Stat. § 1–21 ("where the cause of action originally accrued in favor of a resident"); 7

Guam Code Ann. § 11413 ("one who has been a citizen"); 32 P.R. Laws Ann. § 263 ("one who has been a citizen"); C.Z.Code tit. 4, § 111 (1934), *quoted in* Ester, *supra*, at 83 ("one who has been a resident"). In contrast, only three statutes (including Nevada's) leave the requirement in the present tense. *See* Haw.Rev.Stat. § 657–9 ("except in favor of a domiciled resident thereof, who has held the cause of action from the time it accrued"); Minn.Stat. § 541.14 (repealed 1977), *quoted in Sautter v. Interstate Power Co.*, 567 N.W.2d 755, 757 n. 2 (Minn.Ct.App.1997) ("unless the plaintiff be a citizen of the state who has owned the cause of action since it accrued"). Hawaii case law has not addressed the timing issue. *Cf. Roxas v. Marcos*, 89 Hawai'i 91, 969 P.2d 1209, 1235 n. 16, 1245–47 (1998) (applying the statute to a plaintiff who apparently was never a resident). Minnesota case law addresses it only with suggestive language, and cases can be cited that provide

We have one further reason for rejecting the district court's interpretation: It raises a serious constitutional question. The Supreme Court has held that states can apply their borrowing statutes to foreigners while exempting their own citizens. *Can. N. Ry. v. Eggen,* 252 U.S. 553, 40 S.Ct. 402, 64 L.Ed. 713 (1920). But after *Saenz v. Roe,* 526 U.S. 489, 119 S.Ct. 1518, 143 L.Ed.2d 689 (1999), it's far from clear that states can apply them to *newly arrived* citizens while exempting long-time ones. The Privileges or Immunities Clause protects the right to select one's state of abode; discrimination based on length of citizenship infringes this right. *See id.* at 502–04, 119 S.Ct. 1518; *see also Corfield v. Coryell,* 6 F. Cas. 546, 552 (C.C.E.D.Pa.1823) (No. 3230) (Washington, J., on circuit) (ranking as fundamental "[t]he right of a citizen of one state to pass through, or to reside in any other state"). Perhaps the state could justify the discrimination as a good-faith residency requirement. *See Saenz,* 526 U.S. at 517, 119 S.Ct. 1518 (Rehnquist, C.J., dissenting). But the question is close enough that we shouldn't go out of our way to confront it.

The district court reached the opposite result by relying on two unpublished decisions. One was a state trial court decision, *Mikhael v. Steak & Ale of Louisiana, Inc.,* No. CV89–3790 (Nev.2d Dist. Ct., Washoe County, Apr. 10, 1990). But *Mikhael* failed to offer any reasoning to support its construction of the statute, *id.,* slip op. at 2, and we attach no weight to unreasoned conclusions in unpublished state decisions, *see Spinner Corp. v.*

*Princeville Dev. Corp.,* 849 F.2d 388, 390 n. 2 (9th Cir.1988).

The second was a Nevada federal district court decision, *Volz v. DeLorean Manufacturing,* No. CV–N–86–102–HDM (D.Nev. Feb. 18, 1987). *Volz* reasoned that because California, Idaho and Utah require citizenship at the time of accrual, Nevada does too. *Id.,* slip op. at 3–4. But, as noted above, the statutes in each of those other states use different language precisely where it counts. *Volz* overlooked this difference, and the court below was too hasty in following it.

Finally, we reject the argument that our interpretation conflicts with the borrowing statute's purpose of avoiding forum shopping. The fact that the statute includes an exemption for Nevada citizens indicates that the Nevada legislature sought to balance the purpose of avoiding forum shopping against that of keeping litigation options open for its citizens. Recognizing one purpose tells us nothing about how the legislature calibrated it against the other. To determine *that,* we must look to the statute's text, as we have done.

Flowers held her cause of action from the time it accrued, and she was a citizen of Nevada when she filed her complaint. The exemption to Nevada's borrowing statute requires no more. Flowers's suit is not covered by the borrowing statute, so Nevada's two-year statute of limitations governs all her defamation claims.

**2.** Because the statute of limitations is two years rather than one, we reverse dismissal of the claims related to Stepha-

weak support for both positions. *Compare Klemme v. Long,* 184 Minn. 97, 237 N.W. 882, 886 (1931) ("None of the parties are residents of Minnesota .... Therefore [the action] is barred."), *and Devine v. Rayette–Faberge, Inc.,* 285 F.Supp. 1006, 1009 (D.Minn.1968) ("The borrowing statute [applies only to] ... a plaintiff who is not a Minnesota citizen."), *with Whitney v. Daniel (In re Daniel's Estate),* 208 Minn. 420, 294 N.W. 465, 469 (Minn. 1940) ("The respondent has been a resident of this state ever since the cause of action accrued.... [I]t is sufficient to say that the cause of action has been owned by a citizen of this state ever since it accrued.").

nopoulos's 1998 Larry King interview and remand for consideration of the merits.[4] Some of Flowers's other claims, however, are so old that they are barred even under the two-year statute of limitations.

 Flowers objects to passages in Carville's memoirs, *All's Fair: Love, War, and Running for President*, but that book was published in 1994, five years before she filed suit. Her only argument for resurrecting the claim relies on the continuing tort doctrine: When a tort involves continuing wrongful conduct, the statute of limitations doesn't begin to run until that conduct ends. *Page v. United States*, 729 F.2d 818, 821 (D.C.Cir.1984). The doctrine applies where there is "no single incident" that can "fairly or realistically be identified as the cause of significant harm." *Id.* at 821–22 (internal quotation marks omitted). Here, however, publication of the book was a single incident. "[A] cause of action for defamation accrues immediately upon the occurrence of the tortious act and thus, is not appropriate for the continuing violation exception." *Lettis v. U.S. Postal Serv.*, 39 F.Supp.2d 181, 205 (E.D.N.Y.1998). The only thing "continuing" about this tort was Flowers's protracted failure to bring a lawsuit when she had the chance.

 3. The claims against Hillary Clinton for allegedly disclosing private information and organizing break-ins are also untimely under the applicable two-year statute of limitations. *See Turner v. County of Washoe*, 759 F.Supp. 630, 637 (D.Nev.1991) (interpreting Nev.Rev.Stat. 11.190(4)(c)). The complaint is not a model of clarity as to what Clinton supposedly did or when. But when the district court asked whether the claims were timely, Flowers didn't respond with a date within the limitations period—she invoked the continuing tort doctrine instead. *Flowers*, 112 F.Supp.2d at 1213; Tr. of Dist. Ct. Hr'g at 49. Flowers has therefore waived any claim that the events actually occurred within the limitations period. Moreover, because disclosing private information and organizing break-ins are discrete wrongful acts, the continuing tort doctrine does not apply, and the district court properly dismissed the claims as untimely.

### Defamation

1. The district court reached the merits of three defamation claims. The first concerned Carville's 1998 appearance on Larry King Live. Flowers accuses Carville of uttering the following (moderately incomprehensible) remark:

> "One of the things is to remember, we'll go back to the Gennifer Flowers statement; I think the[y] found that tape was doctored and CNN [even] found our, like 19 or 12 different places."

*Flowers*, 112 F.Supp.2d at 1211 n. 3 ( [sic]s omitted).

The second involved Stephanopoulos's memoirs, *All Too Human: A Political Education* (1999). Flowers, who seems to have read them more closely than most, complains about a number of passages. The book recounts how, after learning of the original story in the *Star*, Stephanopoulos planned his response to the media: "I came up with a no-comment denial: 'I'm not going to comment on that tabloid trash.'" *Id.* at 57. Shortly thereafter, the book describes how Stephanopoulos called a news reporter at the Associated Press and told him not to run the story: " 'You can't put this crap on the wire,' I said." *Id.* He next recalls his dismay the following week when the *Star* ran the second.

---

4. The district court didn't consider the merits of this claim, and Stephanopoulos didn't argue them apart from a vague assertion that the statements were pretty much the same as the ones he had made elsewhere. We decline to address the matter in the first instance.

story, in which Flowers conceded the affair: "[A]ny fun I was having faded fast a week later, when Gennifer Flowers flipped. Another Thursday, another *Star* story, another garbage day. But this one was more serious." *Id.* at 59. Finally, he describes his reaction to her press conference tapes: *"The conversation did sound stilted; her questions were leading—maybe the tapes were doctored? It's a setup.* Later investigations by CNN and KCBS would show that the tapes were 'selectively edited,' but there was no getting around the fact that by talking to her on the phone, Clinton had put everything we worked for at risk." *Id.* at 68.

The final claim involves a CNBC interview with Tim Russert in 2000, where Stephanopoulos, discussing the tapes, said, "Oh, it was absolutely his voice, but they were selectively edited in a way to—to create some—some impression." *Flowers,* 112 F.Supp.2d at 1211 n. 5.

■■■■ We agree with the district court that the trio of colorful waste metaphors—the references to the *Star* stories as "trash," "crap" and "garbage"—are not defamatory under Nevada law. "[M]ere rhetorical hyperbole" is not actionable. *Wellman v. Fox,* 108 Nev. 83, 825 P.2d 208, 211 (1992). Wal-Mart can call a competitor's store "trashy," even if the store is not, in fact, unkempt. *Levinsky's, Inc. v. Wal–Mart Stores, Inc.,* 127 F.3d 122, 129–30 (1st Cir.1997) (no relation). And the *Washington Times* can call the protest signs in Lafayette Park the "garbage" of "pitiable lunatics" with impunity. *Thomas v. News World Communications,* 681 F.Supp. 55, 60, 63 (D.D.C.1988). Even assuming that the "trash," "crap" and "garbage" statements were directed at Flowers rather than at the *Star* or the situation as a whole, they are nothing more than generic invective. *See Levinsky's,* 127 F.3d at 129 ("The vaguer a term, ... the less likely it is to be actionable."). The

law provides no redress for harsh name-calling.

■■■■ We reach a different conclusion as to the statements that the tapes were "doctored" or "selectively edited." The district court held these to be nondefamatory "opinion[s]" based on news reports. Of Carville's statement that "[CNN] found that tape was doctored," it said:

[This allegation] is clearly an expression of opinion[,] not a factual assertion. [It] accurately refers to a CNN investigation and news report that taped conversations between President Clinton and Flowers were at least edited. He relies on such reports as the basis for his opinion and Flowers does not dispute that both CNN and KCBS made such reports. Carville's statement is thus not capable of a defamatory meaning.

*Flowers,* 112 F.Supp.2d at 1211. The district court classified Stephanopoulos's similar remarks—his speculation at the time that *"maybe the tapes were doctored"* and his statement that "CNN and KCBS would show that the tapes were 'selectively edited' "—as "statements of opinion based upon news reports by CNN and KCBS that audio tapes within Flowers[']s] possession had been edited." *Id.* at 1211–12.

An unadorned claim that "Flowers doctored the tapes" would surely be defamatory. To "doctor" is to "conceal the real state or actual quality of by deceptive alteration." *Webster's Third New International Dictionary* 666 (Philip Babcock Gove et al. eds., 1981). The claim would imply that Flowers fraudulently altered the tapes to make her allegations more plausible.

■■■■ Defendants argue that "doctor" can also be used in a neutral sense; *Webster's* does define it alternatively as "to adapt or modify for a desired end by alteration or special treatment," as in "[doc-

tored] the play by tightening its whole structure and abridging the last act." *Id.* We doubt, though, that anyone would understand the statement in this sense—just as we doubt that anyone would assume Flowers "doctored" the tapes by nursing them back to health. At the very least, it isn't the *only* reasonable construction; if a statement is " 'susceptible of different constructions, one of which is defamatory, resolution of the ambiguity is a question of fact for the jury.' " *Posadas v. City of Reno,* 109 Nev. 448, 851 P.2d 438, 442 (1993) (quoting *Branda v. Sanford,* 637 P.2d 1223, 1225–26 (Nev.1981)).

A statement that Flowers "selectively edited" the tapes could also be defamatory. While somewhat more neutral, it still insinuates deception. A jury could find that it implies Flowers altered the tapes to make them more corroborative of her claims.

We do not understand the district court to disagree with the foregoing analysis. Instead, it seems to have found dispositive that Carville and Stephanopoulos did not say outright that the tapes were doctored, but only reported that earlier news reports had said so. This argument has some intuitive appeal. After all, the statement "An expert on KCBS said that the tapes had been edited to enhance Flowers's credibility" may be literally true, even if the KCBS expert is wrong.

 Unfortunately, the district court overlooked the venerable principle that a person who repeats a defamatory statement is generally as liable as the one who first utters it:

> On the quaint homespun logic that "[t]alebearers are as bad as talemakers," each repetition of a defamatory statement by a new person constitutes a new publication, rendering the repeater liable for that new publication.... The law deems the repeater to "adopt as his own" the defamatory statement. Liability for repetition of a libel may not be avoided by the mere expedient of adding the truthful caveat that one heard the statement from somebody else.

1 R. Smolla, *Law of Defamation* § 4:87, at 4–136.3 to –136.4 (2d ed.2001) (footnotes omitted). "Every repetition of the defamation is a publication in itself, even though the repeater states the source, or resorts to the customary newspaper evasion 'it is alleged'...." *Prosser and Keeton on the Law of Torts* § 113, at 799 (5th ed.1984) (footnotes omitted); *see, e.g., Liberty Lobby, Inc. v. Dow Jones & Co.,* 838 F.2d 1287, 1298–99 (D.C.Cir.1988). Were this not the rule, there would be no need for the common law privilege for fair reports of official proceedings, *see Sahara Gaming Corp. v. Culinary Workers Union Local 226,* 115 Nev. 212, 984 P.2d 164, 166–68 (1999), or the constitutional privilege of "neutral reportage" that some courts have recognized, *see Edwards v. Nat'l Audubon Soc'y, Inc.,* 556 F.2d 113, 120 (2d Cir.1977); *Barry v. Time, Inc.,* 584 F.Supp. 1110, 1124–28 (N.D.Cal.1984).[5]

The republication rule applies here. Carville said that CNN "found that tape was doctored," and Stephanopoulos stated that KCBS and CNN reported that the tapes were "selectively edited." The fact that Carville and Stephanopoulos may have "accurately refer[red]" to the news reports, *Flowers,* 112 F.Supp.2d at 1211, does not alone excuse them for repeating their contents.

---

5. Neither privilege applies to the tape-doctoring remarks here. The common law fair report privilege is inapplicable because the statements are not related to an official proceeding. *Sahara Gaming,* 984 P.2d at 168.

The neutral reportage privilege is inapplicable because the context in which these statements were made belies any claim that they were merely "neutral reports" of the earlier news stories. *Edwards,* 556 F.2d at 120.

We have held that "when a speaker outlines the factual basis for his conclusion, his statement is protected." *Partington v. Bugliosi,* 56 F.3d 1147, 1156 (9th Cir.1995). This assumes, however, that the factual basis itself is true. *See Standing Comm. v. Yagman,* 55 F.3d 1430, 1440 (9th Cir.1995) (" '[W]here a publication sets forth the facts underlying its statement of opinion ... *and those facts are true,* the Constitution protects that opinion from liability for defamation.' " (quoting *Lewis v. Time, Inc.,* 710 F.2d 549, 556 (9th Cir.1983)) (emphasis added)). A speaker can't immunize a statement that implies false facts simply by couching it as an opinion based on those facts. *See Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 19, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). Likewise, a defamatory statement isn't rendered nondefamatory merely because it relies on another defamatory statement. In this case, the truth of the news reports on which defendants claim to have relied is disputed. Defendants' accusations of tape-doctoring are therefore capable of defamatory meaning.

This doesn't necessarily mean that Flowers can maintain her suit. As we explain below, unless defendants knew the news reports were probably false or had some obvious reason to doubt their accuracy, their reliance is protected by the First Amendment. But if it turns out that defendants knew the news reports were wrong—or acted with reckless indifference in the face of some clear warning sign— then they weren't entitled to repeat them publicly and later claim that they were merely expressing nondefamatory opinions.

2. The prospect of liability for defamation has the obvious potential of chilling public debate. First Amendment concerns are particularly acute when the plaintiff is a public figure—someone who, for example, "voluntarily injects himself or is drawn into a particular public controversy." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 351, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). Public figures "assume special prominence in the resolution of public questions," *id.,* and the First Amendment demands more stringent proof of wrongdoing when they sue their detractors.

Flowers is a public figure, at least with respect to the controversy here. Her affair with the governor of a state made the headlines in a national tabloid. To corroborate her story, she held a press conference where she played tape recordings of his phone calls—all during a presidential nomination campaign.[6] If all this doesn't make her a public figure, it's hard to imagine what would.[7]

A public figure plaintiff must show that the defendant acted with "actual malice"—that is, "knowledge that [a statement] was false" or "reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan,* 376 U.S. 254, 280, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The plaintiff can meet this burden by showing either that the defendant knew his statements were probably false, or that he disregarded obvious warning signs of falsity.

**6.** These facts are conceded in the complaint, Am. Compl. ¶ 11, so we may consider them on a motion to dismiss.

**7.** By tape recording Clinton's phone calls and holding a press conference to play them, Flowers voluntarily injected herself into the fray, or at least threw kerosene on the flames once the conflagration was underway. We can therefore stay clear of the intercircuit conflict over purely involuntary public figures. *Compare Dameron v. Wash. Magazine, Inc.,* 779 F.2d 736, 741–42 (D.C.Cir.1985) (stating that people can become public figures through sheer bad luck), *with Wells v. Liddy,* 186 F.3d 505, 538–40 (4th Cir.1999) (requiring some showing that the person assumed the risk of publicity).

*Masson v. New Yorker Magazine, Inc.,* 960 F.2d 896, 900 (9th Cir.1992). This burden must be satisfied by clear and convincing evidence. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255–56, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Flowers alleged in her complaint that defendants knew that their statements were false or acted with reckless disregard of the truth. Am. Compl. ¶ 30. If Flowers can prove this claim by clear and convincing evidence, then she is entitled to recover.

One who repeats what he hears from a reputable news source, with no individualized reason external to the news report to doubt its accuracy, has not acted recklessly. *See Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 688, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989) ("[F]ailure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard."). But if someone knows that the news story is false, he can't sanitize his republication by purporting to rely on the news source. Nor can he claim immunity if he has conflicting information from another source and recklessly disregards it. *See id.* ("In a case … involving the reporting of a third party's allegations, 'recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.'" (quoting *St. Amant v. Thompson,* 390 U.S. 727, 732, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968))).

Defendants argue that "reliance on reports of reputable news organizations cannot constitute actual malice as a matter of law." Appellees' Br. at 57. We agree with their statement of the rule, but find it inapplicable to them at this early stage in the proceedings. Defendants were not uninvolved third parties who clearly lacked access to the facts behind the published reports. If they knew that the news reports were false or had information from other sources that raised obvious doubts, then they didn't "rely" on the news stories; they simply hid behind them. What defendants actually want is a rule that *purported* reliance on reputable news sources cannot constitute actual malice—but that is not the law.

This case is before us on a motion to dismiss. We ask only whether the pleadings are sufficient, not whether the plaintiff could find evidence to support them. *See, e.g., In re GlenFed, Inc. Sec. Litig.,* 42 F.3d 1541, 1547 (9th Cir.1994) (en banc) ("[P]laintiffs may aver [state of mind] generally, just as [Rule 9(b)] states—that is, simply by saying that [it] existed."). The First Amendment imposes substantive requirements on the state of mind a public figure must prove in order to recover for defamation, but it doesn't require him to prove that state of mind in the complaint. As the Fifth Circuit has explained:

> The Court in *New York Times* required "convincing clarity" of the proof presented to show actual malice[;] however, this requirement extends only to the proof required to meet the constitutional demands. As to the *complaint,* the Federal Rules of Civil Procedure require only that "[m]alice, intent, knowledge, and other condition of mind of a person … be averred generally." Rule 9(b).

*Belli v. Orlando Daily Newspapers, Inc.,* 389 F.2d 579, 589 (5th Cir.1967) (citation omitted); *see also Boyd v. Nationwide Mut. Ins. Co.,* 208 F.3d 406, 410 (2d Cir. 2000).

The First Amendment is not irrelevant at the pleading stage. We have held that "where a plaintiff seeks damages … for conduct which is prima facie protected by the First Amendment, the danger that the mere pendency of the action will chill the exercise of First Amendment rights requires more specific allegations than would otherwise be required." *Franchise*

*Realty Interstate Corp. v. S.F. Local Joint Executive Bd. of Culinary Workers,* 542 F.2d 1076, 1082–83 (9th Cir.1976).[8] Flowers's complaint lists the precise statements alleged to be false and defamatory, who made them and when. That she averred the required state of mind generally, without alleging corroborating evidence, does not defeat her complaint. Flowers has done more than simply allege that she was "libeled with malice." Her complaint is sufficient.[9]

 Actual malice is a subjective standard that turns on the defendant's state of mind; it is typically proven by evidence beyond the defamatory publication itself. For that reason, "the issue of 'actual malice' . . . cannot be properly disposed of by a motion to dismiss," where the plaintiff has had no opportunity to present evidence in support of his allegations. *Metabolife Int'l, Inc. v. Wornick,* 264 F.3d 832, 848 (9th Cir.2001). The district court threw out Flowers's lawsuit before she had a chance to depose witnesses, request documents and otherwise pursue evidence necessary to her case through the discovery process. It may be improbable that Flowers will find evidence to support her claims, but improbable is not the same as impossible. For example, Flowers asserts that Anthony Pellicano, the expert appearing in one of the two news stories, was a shill for the Clintons. Appellant's Opening Br. at 27. She alleged that the expert appearing in the other story was another Clinton cut-out. Tr. of Dist. Ct. Hr'g at 54–55.[10] If Flowers can prove that defendants were involved in manufacturing the two news stories, she may be able to persuade a jury that they knew the stories were false or recklessly disregarded the truth. Because Flowers has had no chance to present evidence supporting her claims, we cannot hold that defendants acted without actual malice as a matter of law.

Flowers no doubt faces an uphill battle on remand. To survive summary judgment, she will have to marshal clear and convincing evidence that defendants knew the news reports were probably false or disregarded obvious warning signs from other sources.[11] The difficulty of her task ahead, however, is no reason to deny her the opportunity to make the attempt.[12]

8. Despite the apparent breadth of its holding, we have yet to apply *Franchise Realty* outside the *Noerr–Pennington* context. We also note some tension between *Franchise Realty* and *Calder v. Jones,* 465 U.S. 783, 790–91, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984) ("We have . . . declined in other contexts to grant special procedural protections [in defamation suits] in addition to the [substantive First Amendment] protections . . . ."). Because Flowers's complaint satisfies either pleading standard, we assume that *Franchise Realty* applies.

9. Complaints we have dismissed under *Franchise Realty* are not analogous to Flowers's. *See, e.g., Kottle v. Northwest Kidney Ctrs.,* 146 F.3d 1056, 1063 (9th Cir.1998) (complaint failed to identify misrepresentations made or methods of improper advocacy used); *Or. Natural Res. Council v. Mohla,* 944 F.2d 531, 535–36 & n. 4 (9th Cir.1991) (complaint failed to explain why challenged lawsuit was baseless; allegations of misrepresentation were

verifiably meritless); *see also Franchise Realty,* 542 F.2d at 1081, 1085 (complaints failed to identify relevant activities and content of allegedly false statements).

10. Defendants point out that these assertions weren't made in the complaint. We don't rely on the assertions to show the sufficiency of Flowers's pleadings. We mention them to illustrate the kind of evidence Flowers could find that might bear on whether defendants acted knowingly or recklessly.

11. She could also survive summary judgment by offering clear and convincing evidence that any defamatory, material discrepancies between the news reports and the statements were intentional or reckless.

12. The district court denied Flowers's requests to amend her complaint a second and third time because the former was moot and the latter would be futile. *Flowers,* 112

## False Light

■ Flowers brought a parallel false light claim with each defamation claim. The district court dismissed them all as duplicative. *Flowers*, 112 F.Supp.2d at 1212. We conclude they are not.

The false light invasion of privacy tort is an odd hybrid of defamation and intentional infliction of emotional distress, a jurisprudential offspring that recalls George Bernard Shaw's witty rebuff of Isadora Duncan.[13] Judges and legal scholars have puzzled over its existence. *See* 1 J.T. McCarthy, *The Rights of Publicity and Privacy* § 5:105, at 5–241 to –244 (2d ed.2000) (noting that "courts have yet to draw a clear and distinct line between [defamation and false light]"); *see also Cain v. Hearst Corp.*, 878 S.W.2d 577, 579–80 (Tex.1994) (joining several other jurisdictions in refusing to recognize the tort on the grounds that it is largely duplicative and chills free speech).

■ False light, like defamation, requires at least an implicit false statement of objective fact. *See Restatement (Second) of Torts* § 652E(b) (1977); *e.g., Solano v. Playgirl, Inc.*, 292 F.3d 1078, 1082, 1084 (9th Cir.2002) (finding that a picture of an actor on the cover of Playgirl magazine, surrounded by lurid captions, created the "false impression" that he appeared nude inside the magazine). And just like public figure defamation, it requires actual malice—knowing or reckless disregard of the truth. *Restatement (Second) of Torts* § 652E(b); *see also Solano*, 292 F.3d at 1084; *Leidholdt v. L.F.P. Inc.*, 860 F.2d 890, 893 (9th Cir.1988). In view of these rather pronounced similarities, we have some sympathy for the district court's disposition.

■ In Nevada, however, false light extends beyond defamation in one respect: A plaintiff need not show injury to reputation. " 'The false light privacy action differs from a defamation action in that the injury in privacy actions is mental distress from having been exposed to public view, while the injury in defamation actions is damage to reputation.' " *People for the Ethical Treatment of Animals v. Bobby Berosini, Ltd.*, 111 Nev. 615, 895 P.2d 1269, 1274 n. 4 (1995) (quoting *Rinsley v. Brandt*, 700 F.2d 1304, 1307 (10th Cir. 1983)), *overruled in part on other grounds by City of Las Vegas Downtown Redevelopment Agency v. Hecht*, 113 Nev. 644, 940 P.2d 134 (1997); *see also Restatement (Second) of Torts* § 652E cmt. b. Some falsehoods may cause subjective emotional distress even though they cause no loss of esteem; an example the *Restatement* gives is a purported biography that adds flattering but fabricated embellishments. *Restatement (Second) of Torts* § 652E cmt. b, illus. 5. In these cases, false light may permit recovery even though defamation would not.

The district court relied on California case law. *See Flowers*, 112 F.Supp.2d at 1212 (citing *Couch v. San Juan Unified Sch. Dist.*, 33 Cal.App.4th 1491, 39 Cal. Rptr.2d 848 (1995)). But California, unlike Nevada, requires injury to reputation for

---

F.Supp.2d at 1214. These rationales are no longer valid, but because the district court has discretion whether to allow amendment, *Solomon v. N. Am. Life & Cas. Ins. Co.*, 151 F.3d 1132, 1138–39 (9th Cir.1998), we merely vacate the denials and remand for a new decision. The district court dismissed the conspiracy claim because it had dismissed all of the underlying claims. *Flowers*, 112 F.Supp.2d at 1213. We vacate this decision but leave it to the district court to dispose of the claim on any appropriate factual or legal ground.

13. *See, e.g.,* Mardy Grothe, *Never Let a Fool Kiss You or a Kiss Fool You* 112 (1999), *quoted at Masters of Chiasmus: George Bernard Shaw* (2002), *at* http://www.chiasmus.com/mastersofchiasmus/shaw.shtml.

both false light and defamation. *See Solano*, 292 F.3d at 1082 (citing *Fellows v. Nat'l Enquirer, Inc.*, 42 Cal.3d 234, 228 Cal.Rptr. 215, 721 P.2d 97, 99–101 (1986)). In California, therefore, "[a]n action for invasion of privacy by placing the plaintiff in a false light in the public eye is in substance equivalent to a libel claim." *Selleck v. Globe Int'l, Inc.*, 166 Cal.App.3d 1123, 1133, 212 Cal.Rptr. 838 (1985) (citation omitted). The same is not true in Nevada.

Flowers has alleged emotional harm separate from injury to her reputation. *See* Am. Compl. ¶ 35. A jury could award her damages for false light but not for defamation if it found that she suffered subjective distress but not reputational injury. Because of this theoretical possibility, we must reverse the district court's ruling as to the false light claims.[14]

### Conclusion

Just as Bill Clinton's critics are free to attack his scruples and sincerity in the public media, his supporters are free to defend him; the law will rarely hold any of them responsible for their words. This freedom, however, is not absolute. Even among public figures, defamation—that tort "[w]hose sting is sharper than the sword's"[15]—can leave scars that in ·the most egregious circumstances demand redress.

Gennifer Flowers claims that defendants knew she was telling the truth, knew the tapes weren't doctored, knew the news reports they claimed to rely on were wrong, but accused her of being a liar and a fraud anyway. If Flowers's claims are true, her suit does not offend the First Amendment. She has produced no evidence yet to support them, but under our system of civil procedure, she must be given at least some chance to seek it before her lawsuit is thrown out of court.

We AFFIRM the district court's dismissal of all claims based on Carville's book, the disclosure and intrusion claims against Clinton, and all claims based on Stephanopoulos's book other than those related to the tape-doctoring passage. We REVERSE dismissal of the defamation and false light claims based on Carville's Larry King interview, Stephanopoulos's Larry King interview, and the tape-doctoring passage in Stephanopoulos's book. We VACATE the denial of leave to file a second and third amended complaint and the dismissal of the conspiracy claims. We remand for further proceedings in accordance with our instructions. Each party shall bear its own costs in this appeal.

---

14. The false light tort does not allow recovery for rhetorical hyperbole, *see Partington*, 56 F.3d at 1157, 1160; it is not a continuing tort when based on a discrete publication, *see Mittleman v. U.S. Dep't of Treasury*, 919 F.Supp. 461, 466–67 (D.D.C.1995); and it has the same statute of limitations as defamation, *see Turner*, 759 F.Supp. at 637. We therefore affirm dismissal of the false light claims where we have affirmed dismissal of the parallel defamation claims.

15. Bill Shakespeare, *The Winter's Tale*, act 2, sc. 3.