Gary CONDIT, Plaintiff,

v.

Dominick DUNNE, Defendant.

No. 02 Civ. 9910(PKL).

United States District Court,
S.D. New York.

April 27, 2004.

L. Lin Wood, Katherine M. Ventulett, L. Lin Wood, P.C., Atlanta, GA, Mark E. Goidell, Lazer, Aptheker, Rosella & Yedid, P.C., Melville, NY, for Plaintiff.

Laura R. Handman, Samuel M. Leaf, Davis Wright Tremaine LLP, New York, NY, for Defendants.

### OPINION AND ORDER

LEISURE, District Judge.

This action brings the Court to the tire-streaked intersection of the right of one citizen to protect his reputation and the right of another citizen to speak freely. Plaintiff in this case is Gary Condit, a former member of the United States House of Representatives, who served as Congressman for the 18th Congressional District of California. Defendant is Dominick Dunne, a special correspondent to *Vanity Fair* magazine, author, and television commentator. Plaintiff brings the action against defendant for slander, based upon comments made by defendant during appearances on, *inter alia, The Laura Ingraham Show* and *Larry King Live.* Plaintiff claims that defendant uttered false statements that implicated plaintiff in an alleged kidnapping and/or murder of Chandra Levy, an acquaintance of plaintiff who disappeared in 2001.

Defendant now moves to dismiss the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted, arguing primarily that the statements at issue are opinions, and as such are not actionable. Defendant moves alternatively for summary judgment under Rule 56. Plaintiff opposes the motion. For the reasons set forth below, the Court denies in part and grants in part defendant's motion to dismiss the complaint.

### Background

I. *Factual History*

For the purposes of defendant's motion, the Court accepts the allegations stated in the complaint as true. *Rothman v. Gregor,* 220 F.3d 81, 91 (2d Cir.2000). There-

fore the relevant facts, as alleged by plaintiff in his complaint, are as follows.

### A. Ms. Levy's Disappearance

Plaintiff, a resident of California, served as a member of the United States House of Representatives as a Congressman for the 18th Congressional District of California at all times relevant to this action. (Plaintiff's Amended Complaint, ¶¶ 2–3 ("Compl.").) On or about May 1, 2001, Ms. Levy, a 24–year old employee of the United States Bureau of Prisons, disappeared from her downtown Washington, D.C. apartment. (Compl., ¶ 13.) Shortly after Ms. Levy's disappearance, plaintiff publicly acknowledged that he and Ms. Levy were friends. (Compl., ¶ 15.) As law enforcement investigated Ms. Levy's disappearance, a media frenzy ensued which focused in large part on speculation about the relationship between plaintiff and Ms. Levy. (Compl., ¶¶ 16–17.)

### B. Defendant's Statements During the Pending Investigation

Defendant, a resident of New York, is a special correspondent for *Vanity Fair* magazine, an author, and a television commentator. (Compl., ¶¶ 5–7.) With the disappearance of Ms. Levy still under investigation, defendant spoke publicly on five occasions about plaintiff's possible criminal involvement in Ms. Levy's disappearance. (Compl., ¶¶ 18–20, 28–33.)

#### 1. The Laura Ingraham Show

On December 20, 2001, defendant appeared on *The Laura Ingraham Show,* a nationally syndicated radio talk show, and made statements during an interview that plaintiff describes in his moving papers as "the centerpieces of his complaint for slander." (Compl., ¶ 20; Memorandum of Law of Plaintiff Gary Condit in Opposition to Defendant's Motion To Dismiss the Action, or, in the Alternative, for Summary Judgment, at 3 ("Plaintiff's Opposition").)

Plaintiff includes a transcript of the entire interview in his complaint. (Compl., ¶ 20.) The Court attaches a transcript of the interview on *The Laura Ingraham Show* as an appendix to this opinion and order.

The fully documented interview speaks for itself. *See supra,* Appendix. In short, the radio host, Laura Ingraham, introduces defendant at the outset, noting that defendant is from *Vanity Fair* magazine, that defendant has followed the Chandra Levy case, and that defendant has interesting stories to tell related to that case. Defendant then describes a series of alleged events related to plaintiff and Ms. Levy, in interview style, with Ingraham interjecting intermittently.

Defendant states that he received a call from a person from Salinas, California, who describes himself as a "horse whisperer" or animal behaviorist. Defendant then repeats the substance of the conversation between himself and the horse whisperer. The horse whisperer told defendant that he travels in the Middle East, and that he had met an Arab man at a party who claimed to know about how Ms. Levy disappeared. Defendant states that the horse whisperer described the Arab man as a "procurer," who provided the sexual services of young foreign women in the Middle East and at the "Middle Eastern Embassy" in Washington. Defendant then states the following:

> But according to what the procurer told the horse whisperer who told me, is that Gary Condit was often a guest at some of the Middle Eastern embassies in Washington where all these ladies were, and that he had let it be known that he was in a relationship with a woman that was over, but she was a clinger. He couldn't get rid of her. And he had made promises to her that he couldn't keep and apparently she knew things about him and threatened to go public.

And at one point he said this woman is driving me crazy, or words to that effect. And I wrote all this down at the time. And what the horse whisperer said the procurer said is by saying that, he created the environment that led to her disappearance and she shortly thereafter vanished. And as the horse whisperer said, as he lives in the Middle East a great deal of the time, it's very easy for them to make people disappear. He said that she was put in a limousine, and this procurer claims that he saw her being put on a plane, one of these big commercial-sized private planes that the Arabs have, rich princes, and those people.... And he said, let me put it this way. She wasn't walking. (Compl., ¶ 20 at 10.)

[Ingraham:] And what does [the procurer] think happened to her after that?

[Dunne:] What he said he thought happened to her is that she was dropped at sea.

[Ingraham:] In the Atlantic? Over the Atlantic?

[Dunne:] Yes. (Compl., ¶ 20 at 14.)

Defendant then states that "I heard all these details, okay? I mean I can't vouch for any of this." (Compl., ¶ 20 at 12.) Defendant agrees with Ingraham's description of the horse whisperer as a "respectable individual," (Compl., ¶ 20 at 12.), but notes twice that the horse whisperer changed his story. (Compl., ¶ 20 at 8, 16.)

During the next portion of the interview, defendant describes his subsequent contact with the Federal Bureau of Investigation ("FBI"), and his effort to meet the procurer, which was fruitless. Defendant states that at the time of the interview he did not know the status of any FBI investigation into the story told to him by the horse whisperer. For the remainder of the interview defendant and Ingraham engage in speculation about the story. For example,

Ingraham asks defendant, "[D]oes this surprise you at all, I mean, if indeed some version of this is the truth?" Defendant does not directly answer Ingraham's question, which is embedded in a lengthier statement by Ingraham. (Compl., ¶ 20 at 18.) Also for example, defendant later states, "And, you know, if it is indeed true that [Condit] is a welcomed guest at the Middle Eastern embassies, I mean what is a guy on the House Intelligence Committee doing at those embassies?" (Compl., ¶ 20 at 20.) Defendant and Ingraham agree that the horse whisperer's story makes "beautiful sense." (Compl., ¶ 20 at 18–19.)

### 2. *The Dinner Parties*

After appearing on *The Laura Ingraham Show,* defendant repeated the statements he had made on the show at two dinner parties, one in California and one in New York. (Compl., ¶¶ 28–29, 31–32.) The complaint does not describe any particular statements defendant made at these parties.

### 3. *Entertainment Tonight Online*

In January 2002, Paulette Cohn of *Entertainment Tonight Online* ("ET Online") interviewed defendant. (Compl., ¶ 30.) On January 18, 2002, Cohn's internet column included the following:

"Gary Condit rides with the Hell's Angels as a motorcyclist," Dunne revealed. "He rides with a Haitian motorcycle group in Washington, and I went on 'Larry King' and said that I thought that the reason she left was that she'd gotten on the back of a motorcycle—somebody doing a favor for him—and had been taken away."

The crime writer said that he he [sic] received "a call from a man in Hamburg, Germany, who had just come from the Middle East and had a video of me on

'Larry King.' He says, '[You're wrong,] that's not how it happened'—and [that] he knew how it happened!" With the investigation still pending, Dunne could not reveal any more information, but noted that he's working with authorities in Washington, D.C. (Compl., ¶ 30.)

### 4. *Larry King Live*

On February 13, 2002, defendant appeared on the television show *Larry King Live* for the second time. He had previously appeared on the show and theorized that Ms. Levy had "gone off on the motorcycle of one of Condit's motorcycle friends." (Compl., ¶ 33.) During the February 13 interview on *Larry King Live,* defendant repeated an abbreviated version of the horse whisperer/procurer story that he described on *The Laura Ingraham Show* in December 2001. Defendant also stated, "I believe firmly that he knows more than what he has ever said." (Compl., ¶ 33.)

### C. *Defendant's Statements After Ms. Levy's Remains Were Found*

On May 22, 2002, Ms. Levy's remains were found in Rock Creek Park in Washington, D.C. (Compl., ¶ 34.) Shortly after Ms. Levy's remains were recovered, defendant was interviewed separately by reporters for the *Boston Herald* and *USA Today.* (Compl., ¶¶ 35–36.) The "Inside Track" column of the *Boston Herald* subsequently reported, under the title "Condit get a Dunne-ing," that defendant "still believes Washington intern Chandra Levy was the victim of foul play and the discovery of her body doesn't let Congressman Gary Condit of the hook." (Compl., ¶ 35.) *USA Today,* in its print version and on its website, subsequently published a story titled "Dunne's trail leads to the elite of murders." (Compl., ¶ 36.) *USA Today* quotes defendant as saying "I don't think [Condit] killed her. I think he could have known it was going to happen." (Compl., ¶ 36.)

### D. *Plaintiff's Status With Respect to the Investigation of Ms. Levy's Disappearance and Murder*

Plaintiff had no involvement in the disappearance and murder of Ms. Levy. (Compl., ¶ 39.) Plaintiff has no knowledge of how Ms. Levy was abducted and killed or who is responsible for the crime. (Compl., ¶ 39.) As of the filing of the complaint in this action, no criminal charges have been filed against any individual, including plaintiff, in connection with the disappearance and death of Ms. Levy. (Compl., ¶ 37.) Moreover, law enforcement officials have stated publicly that plaintiff is not a suspect in the investigation. (Compl., ¶ 38.)

## II. *Procedural History*

Plaintiff filed a complaint in December 2002 against defendant for slander *per se,* seeking $1 million in compensatory damages and $10 million in punitive damages for injury to his reputation caused by the false and defamatory statements uttered by defendant. (Compl., ¶¶ 44–51.) Plaintiff brings the action in this Court upon diversity jurisdiction under 28 U.S.C. § 1332. Plaintiff claims, among other things, that "[a]s a direct and proximate result of the slanderous statements uttered by Defendant Dunne, millions of members of the public were led to believe that Plaintiff Condit was guilty of criminal involvement in the disappearance and death of Ms. Levy." (Compl., ¶ 45.) Defendant responded with the current motion to dismiss, or, in the alternative, for summary judgment.

### Discussion

Defendant's motion raises several issues for the Court to decide. In particular, the Court must decide whether the defamation

law of California or New York applies, whether documents submitted in addition to the complaint are properly before the Court on defendant's motion, and whether defendant's statements substantiate a defamation claim, or instead find absolute protection in the First Amendment of the United States Constitution.

## I. *Choice of Law*

■■■ "A federal court sitting in diversity applies the choice of law rules of the forum state," which in this case is New York. *Lee v. Bankers Trust Co.*, 166 F.3d 540, 545 (2d Cir.1999) (citing *Klaxon Co. v. Stentor Elec. Mfg.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). The first inquiry under New York's choice of law analysis is "whether there is an actual conflict of laws." *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir.1998) (citing *Matter of Allstate Ins. and Stolarz*, 81 N.Y.2d 219, 597 N.Y.S.2d 904, 613 N.E.2d 936 (1993)). If no conflict of law confronts the Court, then the choice of law analysis ends with this first inquiry. "Where," however, "the applicable law from each jurisdiction provides different substantive rules, a conflict of law analysis is required." *Id.*

Here, the defamation laws of California and New York conflict. The Court sets forth below the law in California on slander. For the purpose of the choice of law analysis it is sufficient to note that New York law grants opinions greater protection from defamation actions than does California law. California law extends no greater protection to opinions than does the United States Constitution. *See Weller v. American Broadcasting Companies, Inc.*, 232 Cal.App.3d 991, 283 Cal.Rptr. 644, 654 (1991). New York law, by contrast, in excess of the United States Constitution, "provides for absolute protection of opinions." *Celle v. Filipino Reporter Enterprises*, 209 F.3d 163, 178 (2d Cir. 2000). Although the analyses used to apply each state's laws share a likeness, *compare, e.g., Celle,* 209 F.3d at 178 ("The essential task is to decide whether the words complained of, considered in the context of the entire communication and of the circumstances in which they were written, may be reasonably understood as implying the assertion of undisclosed facts justifying the opinion." (internal quotations and alterations omitted)) (New York), *with Rodriguez v. Panayiotou,* 314 F.3d 979, 985 (9th Cir.2002) ("[T]he dispositive issue in this case is whether a reasonable fact finder reading or listening to the statements made by [defendant] could conclude that they imply a provably false factual assertion." (internal quotations omitted)) (California); *see also Levin v. McPhee,* 119 F.3d 189, 196 (2d Cir.1997) ("[T]he thrust of the dispositive inquiry under both New York and constitutional law is whether a reasonable reader could have concluded that the publications were conveying facts about the plaintiff ...." (internal quotations and alterations omitted)), the defamation laws of New York and California sufficiently conflict to require this Court to determine which state's law applies.

■■■ In defamation cases, "New York applies the law of the state with the most significant interest in the litigation." *Lee,* 166 F.3d at 545; *see Nader v. General Motors Corp.,* 25 N.Y.2d 560, 565, 307 N.Y.S.2d 647, 255 N.E.2d 765, 768 (1970); *Babcock v. Jackson,* 12 N.Y.2d 473, 480–81, 240 N.Y.S.2d 743, 191 N.E.2d 279, 283–84 (1963) (employing the analysis set forth in Restatement (Second) Conflict of Laws, § 379). In general, to determine which state has the most significant interest in, or relationship to, the litigation, the Court should look chiefly to "the parties' domiciles and the locus of the tort." *Lee,* 166 F.3d at 545 (internal quotations omitted). "Domicile in a State generally requires a physical presence in the State and an intention to make the State a permanent

home." *Antone v. General Motors Corp.*, 64 N.Y.2d 20, 29, 484 N.Y.S.2d 514, 473 N.E.2d 742, 746 (1984) (citing *Rawstorne v. Maguire*, 265 N.Y. 204, 208, 192 N.E. 294 (1934); Restatement, Conflict of Laws 2d §§ 16, 18). "The locus of a tort is generally determined by the place where the plaintiff suffered injury." *La Luna Enterprises v. CBS Corp.*, 74 F.Supp.2d 384, 389 n. 2 (S.D.N.Y.1999). In a defamation case where the statements at issue are published locally, these two factors are mutually reinforcing, and together they effectively facilitate the choice of law analysis. *See Davis v. Costa-Gavras*, 580 F.Supp. 1082, 1091 (S.D.N.Y.1984). In other words, as the locus of the tort is where the plaintiff suffered injury, often the Court can resolve the choice of law analysis simply by observing the state of plaintiff's domicile and presuming that the publication injured him in that state.

In a defamation case where the statements at issue are published nationwide,[1] however, the locus of the tort factor begs, rather than answers, the ultimate choice of law question. When the publication is made nationwide, the tort essentially lacks a locus, but rather injures plaintiff everywhere at once. In such cases, determining which state has the most significant relationship to the litigation requires a more comprehensive analysis. *See Davis*, 580 F.Supp. at 1092 ("New York courts ... were among the first to recognize that choice of law does not operate in a vacuum but must also seek to advance policies such as those highlighted in section 6 of the Restatement [of Conflicts].("). Defamation claims invoke "conduct regulating rules," as opposed to "loss allocating rules." *See Lee*, 166 F.3d at 545; *AroChem Interna-*

*tional, Inc. v. Buirkle*, 968 F.2d 266, 269–70 (2d Cir.1992). Because a state has an interest in regulating the conduct of its citizens, the state has an interest in having its defamation rules apply when an allegedly defamatory statement is uttered within that state. *See La Luna*, 74 F.Supp.2d at 389. New York, for example, has an interest in regulating the conduct of its media. *See Weinstein v. Friedman*, No. 94 Civ. 6803, 1996 WL 137313, at *7 (S.D.N.Y. Mar.26, 1996). This interest remains even when the target of the statement lives in another state. On the other hand, the state of the plaintiff's domicile has an interest in protecting its citizens from defamation. *See La Luna*, 74 F.Supp.2d at 389; *Machleder v. Diaz*, 538 F.Supp. 1364, 1370 (S.D.N.Y.1982). California, for example, has an interest in protecting its citizens from injury caused by defamatory statements. This interest remains even when the speaker lives in another state.

■ To balance these particular interests in a given case, New York courts weigh all the factors that might impact on the interests of various states in the litigation to make a choice of law determination. *See Davis*, 580 F.Supp. at 1091 ("New York courts recognize the utility of a contacts analysis, similar to that suggested by section 145 of the Restatement, in tort actions involving multistate elements.") (collecting cases). Relevant factors in the choice of law analysis include: where plaintiff suffered the greatest injury, *see, e.g., Davis*, 580 F.Supp. at 1091 (noting that plaintiffs, foreign service officers, in fact suffered the greatest harm in Washington, D.C.); where the statements emanated and were broadcast, *see, e.g., Ma-*

---

1. "Publication" refers not only to written comments, but to any "communication to some third person who understands the defamatory meaning of the statement and its application to the person to whom the refer-

ence is made." *Smith v. Maldonado*, 72 Cal. App.4th 637, 85 Cal.Rptr.2d 397, 402 (1999). Statements orally uttered on national broadcasts, therefore, are "published."

*chleder v. Diaz*, 801 F.2d 46, 51–52 (2d Cir.1986) (noting that "the subject broadcast emanated in Manhattan"); *Levin v. McPhee*, 917 F.Supp. 230, 236 (S.D.N.Y. 1996) (applying New York law because "the conduct at issue—publication of the allegedly libelous statements—took place in New York, where the author resides and where both publishers are headquartered"); where the activities to which the allegedly defamatory statements refer took place, *see, e.g., Reeves v. American Broadcasting Companies, Inc.*, 580 F.Supp. 84, 90 (S.D.N.Y.1983) (applying California law because "the [allegedly defamatory] report centered on investigations of activities that took place in California"); and the policy interests of the states whose law might apply,[2] *see, e.g., Babcock,* 12 N.Y.2d at 482, 240 N.Y.S.2d 743, 191 N.E.2d at 284 (considering "the character of the tort and the relevant purposes of the tort rules involved" among its choice of

law analysis); Restatement (Second) Conflict of Laws § 150 cmt. b. ("Rationale") ("The extent of the interest of each of the potentially interested states should be determined on the basis, among other things, of the purpose sought to be achieved by their relevant local law rules....").

Here, as alleged in the complaint, plaintiff is a resident of Ceres, California. Plaintiff represented the 18th Congressional District of California in the United States House of Representatives at the time defendant uttered the allegedly defamatory statements. As plaintiff was a Congressman, his reputation necessarily was a matter of national significance, but it mattered most in California where he had been elected to office, and where the people whom he represented resided. Defendant is a resident of New York, and contends that most of the statements emanated in New York during interviews he took part in from his home.[3] Defendant's

**2.** In *Palmisano v. News Syndicate Co.,* Judge Irving R. Kaufman, while sitting as a District Court judge, set forth a nine-factor test, to be applied flexibly, to determine which state has the greatest interest in "multistate actions for libel." 130 F.Supp. 17, 19 & n. 2 (S.D.N.Y. 1955). Some federal courts have applied these factors to determine which law to apply in subsequent defamation actions. *See, e.g., Davis,* 580 F.Supp. at 1091–92; *Weinstein,* 1996 WL 137313, at *8–9. New York state courts have neither adopted nor rejected the test set forth by Judge Kaufman, *see La Luna Enterprises,* 74 F.Supp.2d at 389 n. 3 (citing *Lee,* 166 F.3d at 545–46), perhaps because the choice of law issue in defamation cases arises less frequently in state court than in federal court. Here, the Court looks to the criteria set forth by Judge Kaufman not as definitive statements of New York law, but as guidance consonant with the body of New York law on multistate defamation cases.

**3.** Defendant supports his contentions with a declaration he submits in support of his motion. (Declaration of Dominick Dunne, ¶¶ 5, 6.) The complaint does not contain allegations about defendant's specific location at the time

the statements at issue were made, nor about the location where the broadcasts aired. The complaint does indicate incidentally that defendant participated in the interview on *The Laura Ingraham Show* from his house in Connecticut. (Compl., ¶ 33.) Plaintiff submits in opposition to defendant's motion a declaration in which his lawyer states that *The Laura Ingraham Show* broadcasts from Washington, D.C., and *The Larry King Show* broadcasts from Los Angeles, California. (Declaration of L. Lin Wood, ¶¶ 2, 3.) As discussed below, these declarations are not properly before the Court on defendant's motion to dismiss. Although the Court declines to do so, taking these declarations into consideration for the limited purpose of determining which law applies would seem reasonable. *Cf., e.g., Haywin Textile Products, Inc. v. International Finance Inv.,* 137 F.Supp.2d 431, 435 (S.D.N.Y.2001) (staying the motion to dismiss pending the parties' additional submissions from experts on the applicability of Bangladeshi law to the facts of the case). The Court's decision, in any event, that California law properly applies in this case, remains unchanged whether defendant gave the interviews from Manhattan or Connecticut.

statements were broadcast and published in a variety of media nationwide and at two cocktail parties, one in New York and one in California. The activities about which defendant spoke, that is, the disappearance of Ms. Levy and the subsequent investigation, took place in Washington, D.C. This factor thus favors neither the application of California law nor New York law. Moreover, the policy interests of New York and California in having their respective laws applied essentially offset. New York extends greater protection to the media and to opinions than does other jurisdictions, and has an interest in this case in having its defamation laws applied to defendant, who is arguably a member of the media, and who spoke in New York about a matter of national significance. California, on the other hand, does not extend greater protection to the media or to opinions, and has an interest in this case in having its defamation laws applied to protect plaintiff, its resident, from the allegedly defamatory statements of outsiders. In short, New York has an interest here in applying its laws to the speaker, and California has an interest here in applying its laws to the target.

Weighing the factors, the Court finds that California has the most significant interest in the litigation. Certainly New York's interest in the litigation is not insignificant, but none of the conduct about which defendant spoke took place in New York, and plaintiff has no specific connection to New York. Moreover, defendant's comments also have no specific connection to New York, except that defendant happened to be physically present in New York when he uttered the statements that were broadcast nationwide. Defendant, for example, did not speak to a New York audience or through a New York media outlet about a matter of national significance, other than at the New York dinner party. Instead, defendant repeatedly spoke to a national audience about circum-

stances related to a Congressman from California. The Court therefore finds that California has a more significant interest in the litigation than does New York, and accordingly applies California's defamation law. Cf. La Luna, 74 F.Supp.2d at 389 (acknowledging that "New York has an interest in protecting the free speech rights of publishers within its borders," but applying Florida law because, among other things, plaintiff was from Florida and alleged that it suffered injury in Florida); Machleder, 538 F.Supp. at 1370 (finding that New York's interest "in establishing a standard of fault for its news media" is outweighed by New Jersey's "interest in protecting its citizens from defamation").

## II. Motion To Dismiss, Summary Judgment, and Additional Documents

Defendant moves to dismiss the complaint, or alternatively for summary judgment. Plaintiff opposes each ground for relief. Each party submits documents outside the complaint in support of his position.

### A. Motion To Dismiss Standard

█ Defendant moves to dismiss the complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. A movant is entitled to dismissal under Rule 12(b)(6) only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); see also Lipsky v. Commonwealth United Corp., 551 F.2d 887, 894–95 (2d Cir.1976). Nevertheless, the complaint "must contain allegations concerning each of the material elements necessary to sustain recovery under a viable legal theory." Huntington Dental & Med. Co. v. Minnesota Mining & Mfg. Co.Mfg. Co., No. 95 Civ. 10959, 1998 WL

60954, at *3 (S.D.N.Y. Feb.13, 1998). The Court must read the complaint generously and draw all reasonable inferences in favor of plaintiff, accepting the complaint's allegations as true. *Conley,* 355 U.S. at 46, 78 S.Ct. 99; *Hospital Bldg. Co. v. Trustees of Rex Hospital,* 425 U.S. 738, 740, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976); *Dubin v. E.F. Hutton Group Inc.,* 695 F.Supp. 138 (S.D.N.Y.1988). Accordingly, the factual allegations set forth in the complaint do not constitute findings of fact by the Court, but rather are presumed to be true for the purpose of deciding the motion to dismiss. *See Emergent Capital Inv. Mgmt. v. Stonepath Group, Inc.,* 165 F.Supp.2d 615, 625 (S.D.N.Y.2001). Thus, "[t]he issue is not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

### B. *Documents Outside the Complaint*

 "When determining the sufficiency of plaintiff['s] claim for Rule 12(b)(6) purposes, consideration is limited to the factual allegations in [the] complaint ..., documents attached to the complaint as an exhibit or incorporated in it by reference ..., matters of which judicial notice may be taken ..., or documents either in plaintiff['s] possession or of which plaintiff[ ] had knowledge and relied in bringing suit." *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993). "[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint," the court may also take that document into consideration in deciding the defendants' motion to dismiss. *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47–48 (2d Cir.1991). When a party submits additional evidence to the Court beyond that which it may consider on a motion to dismiss, the Court must convert the motion to dismiss into a motion for summary judgment or exclude the extraneous documents from consideration. *See* Fed.R.Civ.P. 12(b); *Fonte v. Board of Managers of Cont'l Towers Condo.,* 848 F.2d 24, 25 (2d Cir.1988).

### C. *The Procedural Posture of Defendant's Motion*

 Here, defendant moves to dismiss the complaint, or alternatively, for summary judgment. Defendant submits documents in support of his motion, including the declaration of defendant's lawyer, Laura R. Handman, Esq. ("Handman Decl."). The Handman declaration includes several attachments, including an audio recording of *The Laura Ingraham Show,* transcripts of defendant's appearances at issue, copies of the print publications at issue, and copies of several publications related to speculation about plaintiff's alleged involvement in Ms. Levy's appearance. Defendant submits these last attachments "to place the comments [made by defendant] in the broader social context of the contemporaneous discussion of the disappearance of Chandra Levy." (Handman Decl., Exhs. 7A–7I, 8A, 8B, 9.) Defendant also submits his own declaration ("Dunne Decl.") in which he states that he took part in the interviews for *The Laura Ingraham Show* and *Larry King Live* from his home in New York. Defendant suggests that the Court convert the motion to dismiss to a motion for summary judgment, and then take into account his additional submissions. Defendant also suggests that the Court, should it decline to treat the motion as one for summary judgment, may take judicial notice of these media publications as evidence of the substantial media coverage dedicated to Ms. Levy's disappearance about which defendant spoke. Defendant, finally, in his briefs, refers at length to matters outside the complaint.

Plaintiff opposes defendant's assertions about the procedural posture of the motion. Plaintiff argues that because defendant has submitted material outside the complaint with his motion, the Court must treat the motion as one for summary judgment. Plaintiff contends that defendant's motion, as such, must be denied because plaintiff has not had adequate time for discovery. Plaintiff submits the declaration of his lawyer, L. Lin Wood, Esq. ("Wood Decl."), in support of his opposition. Mr. Wood states that discovery is needed to develop the issues of falsity and actual malice. (Wood Decl., ¶ 5.) Attached to Mr. Wood's declaration are copies of news reports published shortly after defendant made his remarks on *The Laura Ingraham Show*, offered "[t]o demonstrate that the statements made by defendant on *The Laura Ingraham Show* conveyed that Plaintiff Condit had involved Chandra Levy with a Middle Eastern prostitution ring, had arranged for her kidnapping and disappearance and that her body was dumped over the Atlantic Ocean and that these statements were interpreted as statements of fact by news media around the country." (Wood Decl., ¶ 2, Exhs. 1A–1D.) Plaintiff also submits his own affidavit ("Condit Aff."), in which he states that he has never visited a Middle Eastern embassy in Washington, D.C., he never informed anyone that Ms. Levy was causing him any problems, and that he had no involvement in Ms. Levy's disappearance, apparent kidnapping, or murder. (Condit Aff., ¶¶ 12–14.)

The Court treats defendant's motion as one to dismiss the complaint under Rule 12(b)(6), and declines to convert the motion to one for summary judgment under Rule 56. Plaintiff's assertion that the Court must convert the motion to one for summary judgment is incorrect. The Court may convert defendant's motion to dismiss to a motion for summary judgment, or it may decline to convert the motion to dismiss and exclude from consideration those documents improperly submitted at this stage.

■ As defendant moves to dismiss under Rule 12(b)(6), the Court properly takes into consideration the complaint in deciding the motion. The Court also takes into consideration the audio recording of *The Laura Ingraham Show*, the copies of transcripts of *The Laura Ingraham Show* and *Larry King Live*, and copies of the articles printed in *Entertainment Tonight Online*, the *Boston Herald*, and *USA Today*, submitted by defendant. (Handman Decl., Exhs. 2, 2A, 3, 4, 5, 6.) These recordings and transcripts are referenced and quoted at length in the complaint, but are submitted in their entirety by defendant in association with his motion to dismiss. The Court now takes into account these additional submissions because plaintiff relies on them and they are integral to plaintiff's action. These submissions are the records of the allegedly slanderous statements made by defendant. They aid the Court in its determination of whether plaintiff states a claim for relief, and by including them in its considerations the Court creates no unfairness to either party. *Cf. Kreiss v. McCown DeLeeuw & Co.*, 37 F.Supp.2d 294, 298 n. 3 (S.D.N.Y.1999) (considering documents not attached to the complaint, but which were integral to the plaintiffs' claims, and which the plaintiff had notice of and relied upon); *Knievel v. ESPN, Inc.*, 223 F.Supp.2d 1173, 1176 (D.Mont.2002) (taking into consideration on a motion to dismiss the contents of the website "at the center of Plaintiff's allegations," when the website "is mentioned in the complaint and copies of some of the pictures are attached to the complaint").

■ The Court also takes into consideration the copies of additional news articles that defendant submits "to place [his] comments in the broader social context."

(Handman Decl., ¶ 8, Exhs. 7A–I.) The Court takes these articles into consideration, but only for a limited purpose, as the articles are evidence of the "media frenzy" cited in the complaint that followed the public revelation of the friendship between plaintiff and Ms. Levy. (Compl., ¶¶ 15–17.) The Court does not look to the substance of the articles to resolve any disputed issue on defendant's motion, but does consider the fact of the publication of these articles as evidence of the media frenzy, and thus takes judicial notice of the widespread publicity and speculation that focused on the disappearance of Ms. Levy. *Cf. Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 166 n. 8 (2d Cir.2000) (taking judicial notice of "well-publicized stock prices without converting the motion to dismiss into a motion for summary judgment"); *Cerasani v. Sony Corp.*, 991 F.Supp. 343, 354 n. 3 (S.D.N.Y.1998) (taking judicial notice of "widespread newspaper coverage"); *Cochran v. NYP Holdings, Inc.*, 58 F.Supp.2d 1113, 1123 n. 5 (C.D.Cal.1998) (taking judicial notice of "the overwhelming deluge of publicity attendant to and extensive public discussion of the O.J. Simpson criminal trial"). The Court does not take into consideration any other documents submitted by the parties in association with the motion to dismiss.

## III. *Slander*

■ The question before the Court on defendant's motion to dismiss is simply stated. Do defendant's comments declare or imply a provably false assertion of fact? *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19–20, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990); *Franklin v. Dynamic Details, Inc.*, 116 Cal.App.4th 375, 10 Cal.Rptr.3d 429, 436 (2004). The question is one of law for the Court to decide. *See Rodriguez v. Panayiotou*, 314 F.3d 979, 985 (9th Cir. 2002); *Cochran v. NYP Holdings, Inc.*, 58 F.Supp.2d 1113, 1120 (C.D.Cal.1998); *Smith v. Maldonado*, 72 Cal.App.4th 637,

85 Cal.Rptr.2d 397, 403 (1999); *Weller v. American Broadcasting Companies, Inc.*, 232 Cal.App.3d 991, 283 Cal.Rptr. 644, 651 (1991). The question, however, while simply stated, can be answered only with an understanding of the elements of slander, the purpose of a motion to dismiss, and the principles consequent to the freedom of speech.

Before addressing the central issues presented by defendant's motion, the Court takes a moment to notice the issues that are not raised by defendant's motion. First, the parties do not now dispute whether defendant accurately related the story told to him on the phone by the horse whisperer. Plaintiff does not allege that defendant falsely reported his conversation with the horse whisperer. Plaintiff's complaint contains no allegation that defendant's description of the phone conversation with the horse whisperer and defendant's subsequent efforts to meet the procurer and contact law enforcement is false. Plaintiff, in other words, does not challenge the literal truth of statements to the effect of "the horse whisperer told me on the phone that Mr. Condit is involved with the disappearance of Ms. Levy." Rather, plaintiff claims that the allegations leveled by the horse whisperer and the procurer are false, and that defendant defamed him by publishing, or republishing, these falsehoods.

Second, defendant's motion does not raise the issue of whether defendant published any statements with "actual malice." Because plaintiff is a public official, he must show that defendant spoke with actual malice or with a reckless disregard for the truth to prevail on his defamation claim. *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Plaintiff's complaint contains such an allegation. The issue of defendant's mental state is one of fact, and

is thus not presented by defendant's current motion to dismiss. *See Church of Scientology Int'l v. Behar*, 238 F.3d 168, 173 (2d Cir.2001) ("[R]esolution of the falsity and actual malice inquiries typically requires discovery."); *cf. Barry v. Time, Inc.*, 584 F.Supp. 1110, 1113 n. 4 (N.D.Cal. 1984). (noting that the issue of whether "defendant in fact entertained serious doubts as to the truth of his publication" calls for a "subjective inquiry" that "does not readily permit disposition of a case on summary judgment").

Third, the parties do not dispute that the substance and details of the allegations against plaintiff, namely, that plaintiff was criminally involved in the disappearance of Ms. Levy through his contacts with her alleged kidnappers and killers, are false. In other words, defendant does not now contend that the story told to him by the horse whisperer is true. Moreover, the facts set forth in the complaint, in particular, the public exoneration by law enforcement of plaintiff, describe a reality incompatible with the allegations told to, and republished by, defendant. *Cf. Celle v. Filipino Reporter Enterprises*, 209 F.3d 163, 181 (2d Cir.2000) (Weinstein, J., sitting by designation) ("A public figure seeking recovery in a libel action against a media defendant must establish the falsity of the defamatory statements.").

 Fourth, the parties do not raise a serious question about whether defendant's statements, in each medium, implicate plaintiff. An element of slander is that the statements must be "of and concerning" the plaintiff, either explicitly or impliedly. *See Blatty v. New York Times Co.*, 42 Cal.3d 1033, 232 Cal.Rptr. 542, 547, 728 P.2d 1177 (1986); *Dworkin v. Hustler Magazine, Inc.*, 668 F.Supp. 1408, 1417 n. 11 (C.D.Cal.1987); *see also Rosenblatt v. Baer*, 383 U.S. 75, 82, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966). A statement need not specifically refer to the plaintiff for it to satisfy the "of and concerning" requirement, however. "Under California law, there is no requirement that the person defamed be mentioned by name. It is sufficient if from the evidence the jury can infer that the defamatory statement applies to the plaintiff." *Church of Scientology of California v. Flynn*, 744 F.2d 694, 697 (9th Cir.1984) (internal quotations and alterations omitted). Here, defendant suggests, intermittently, that some of the statements at issue do not refer to plaintiff and thus cannot substantiate a defamation claim. (Defendant's Memo, at 21–22 ("Notably, neither the motorcycle theory nor the alternate theory of Middle Eastern abduction as recounted on *Larry King Live* anywhere mentions plaintiff, much less attributes criminal conduct to him."); at 25 ("[T]he majority of the language in the [*USA Today*] article plaintiff apparently takes issue with is not even of and concerning plaintiff. . . .")). The Court rejects this suggestion by defendant. First, whether defendant's statements are about plaintiff ordinarily presents a factual issue. *Dworkin*, 668 F.Supp. at 1417 n. 11. And second, even a cursory review of the defendant's statements set forth in the complaint reveals that in each publication defendant refers to plaintiff either by name or by implication. Defendant's motion, therefore, does not raise an issue about whether defendant's statements are in fact of and concerning plaintiff.

The Court now turns to whether defendant's statements properly give rise to a defamation action or whether they are protected by the First Amendment of the United States Constitution.

### A. The Elements of Slander Per Se

 Plaintiff brings this action for slander *per se.* Slander is a variety of defamation, a tort involving "the intentional publication of a statement of fact which

is false, unprivileged, and has a natural tendency to injure or which causes special damage." *Ringler Assocs. v. Maryland Casualty Co.*, 80 Cal.App. 4th 1165, 1179, 96 Cal.Rptr.2d 136 (2000). California law defines slander as "a false and unprivileged publication, orally uttered, and also communications by radio or any mechanical or other means." Cal. Civ.Code § 46 ("Slander, false and unprivileged publications which constitute"); *see Rodriguez*, 314 F.3d at 983; *Ringler*, 80 Cal.App. 4th at 1179, 96 Cal.Rptr.2d 136. A privileged publication, therefore, is not slander. A variety of privileges for speech that would otherwise meet the elements of slander arise out of the First Amendment of the United States Constitution. The First Amendment also imposes additional requirements for certain plaintiffs to proceed on a defamation claim, such as the requirement that a public official prove that the defendant spoke with actual malice. When these privileges and requirements apply to protect a statement, then the statement is not actionable because it does not meet the elements of a slander claim.

■ Slander *per se* is a slanderous statement that, because of its content, is presumed to inflict damages. California law enumerates four types of statements that necessarily inflict damages, or, in other words, that qualify as slander *per se*, including statements that "charge[ ] a person with a crime." Cal. Civ.Code § 46(1); *see Rodriguez*, 314 F.3d at 983. Here, plaintiff claims that defendant published false statements about plaintiff that are not privileged, and that the statements inflicted special damages because they charge plaintiff with the alleged kidnapping and murder or Ms. Levy. Plaintiff, therefore, adequately pleads the elements of slander *per se* in his complaint. Plaintiff's suit must be dismissed, however, if it appears beyond a doubt that the facts, as set forth in the complaint, do not support a claim for slander. Specifically, if the Unit-

ed States Constitution protects defendant's statements such that plaintiff cannot satisfy the elements of slander, then the Court must dismiss the complaint.

### B. First Amendment Protection of Allegedly Defamatory Statements

In *Milkovich v. Lorain Journal Co.*, the Supreme Court clarified that First Amendment protection for speech that potentially harms the reputation of others takes shape essentially in two lines of cases, or two free speech doctrines. 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). One doctrine "recognize[s] constitutional limits on the *type* of speech which may be the subject of state defamation actions." *Id.* at 16, 110 S.Ct. 2695. Speech properly categorized as "rhetorical hyperbole," "parody," "loose" and "figurative" finds constitutional protection by this doctrine. *See id.* at 16–17, 110 S.Ct. 2695 (citing *Greenbelt Cooperative Publishing Assn. v. Bresler*, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970) (describing the statements at issue as "rhetorical hyperbole" and "a vigorous epithet"); *Hustler Magazine v. Falwell*, 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988) (outlining constitutional protection of parody); *Letter Carriers v. Austin*, 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974) (describing statements at issue as being used "in a loose figurative sense")). This doctrine "provides protection for statements that cannot 'reasonably be interpreted as stating actual facts' about an individual." *Id.* at 20, 94 S.Ct. 2770 (quoting *Falwell*, 485 U.S. at 50, 108 S.Ct. 876) (alterations omitted). Such statements are immune from defamation actions.

A second line of cases, or free speech doctrine, "places limits on the application of the state law of defamation" to statements about matters of public interest, including matters involving public officials.

*Id.* at 14–16, 94 S.Ct. 2770. Commentary on public officials, public figures, limited public figures, or on matters of public concern finds constitutional protection by this doctrine. *See id.* (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (applying heightened requirements for defamation actions brought by public officials); *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (applying heightened requirements for defamation actions brought by public figures or persons "intimately involved in the resolution of public questions"); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) (applying heightened requirements for defamation actions brought by private plaintiff about matters of public concern); *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986) (shifting the burden of proving falsity to plaintiff in defamation actions brought against media defendants)). This doctrine protects statements about public officials by requiring the public official to prove that the defendant spoke with "actual malice" or with a "reckless disregard for the truth" to prevail on a defamation claim. *Sullivan*, 376 U.S. at 279–80, 84 S.Ct. 710.

■ The Supreme Court in *Milkovich* declined to recognize a third free speech doctrine that would protect statements categorized as opinion. *Id.* at 21, 110 S.Ct. 2695; *see also Weller*, 283 Cal.Rptr. at 652 (rejecting news program's contention "that statements that are phrased in terms of 'conjecture' or inquiry into a matter of public concern are entitled to protection under the *Bresler–Letter Carriers–Falwell* line of cases"). The Court held that the First Amendment offers no greater or lesser protection to opinions than to other statements. The question, therefore, of whether a statement is an opinion for the purpose of determining whether it is protected from suit by the First Amendment and California law, is academic. Rather, the inquiry under the First Amendment and California law focuses on whether the statement's substance or implication constitutes a "provably false assertion of fact." *Rodriguez v. Panayiotou*, 314 F.3d 979, 987 (9th Cir.2002); *Dodds v. American Broadcasting Company, Inc.*, 145 F.3d 1053, 1065 (9th Cir.1998); *Partington v. Bugliosi*, 56 F.3d 1147, 1152–53 (9th Cir. 1995); *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1053 (9th Cir.1990). Because "there is no constitutional value in false statements of fact," *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), a statement that can be reasonably interpreted as asserting or implying a false assertion of fact may fairly substantiate a defamation action.

■ To determine whether a statement declares or implies a false assertion of fact, the Court takes into account a totality of the circumstances. *Franklin v. Dynamic Details, Inc.*, 116 Cal.App.4th 375, 10 Cal.Rptr.3d 429, 437 (2004). The Court looks both to the statement itself and to the context in which it was published. *Id.; see Partington*, 56 F.3d at 1153; *Unelko*, 912 F.2d at 1053; *Rodriguez*, 314 F.3d at 987 ("[C]lose consideration must be given to the language, tenor, and context of the statements made in the dispute. . . ."); *Cochran v. NYP Holdings, Inc.*, 58 F.Supp.2d 1113, 1121 (C.D.Cal. 1998). The Court also considers whether the defendant used figurative or hyperbolic language, and whether the statement is capable of being proved false. *Partington*, 56 F.3d at 1153; *Unelko*, 912 F.2d at 1053.

Defendant contends that none of his statements are actionable. Defendant's moving papers describe some or all of his statements as "speculation," "theories," "hypothesis," "surmises," "opinions," "interpretation," "beliefs," "conjecture," "musing," "idle chatter," and "small talk."

The statements, defendant contends, were not unequivocal assertions of fact. Plaintiff describes the statements in his complaint as "rumor and gossip." Plaintiff contends that defendant's statements constitute assertions of fact.

The Court reviews the publications in turn.

### 1. *The Laura Ingraham Show*

■■■ Defendant's statements on *The Laura Ingraham Show*, described by plaintiff as the centerpiece of his complaint, can be reasonably interpreted as constituting false assertions of fact. Defendant sets forth several specific allegations charging plaintiff with playing a role in an alleged kidnapping and murder of Ms. Levy. Specifically, defendant republished allegations that plaintiff created the environment that led to Ms. Levy's disappearance. Defendant associated plaintiff with an alleged plot, described in detail, to kill Ms. Levy by dropping her from a plane into the Atlantic Ocean, which was alleged to have been carried out in the presence of an Arab procurer who provided the sexual services of young women at Middle Eastern embassies frequented by plaintiff. In addition, defendant describes his subsequent contact with the FBI and his efforts to assist in the investigation of the accusations reported by the horse whisperer. Defendant's description of his pursuit of the investigation would bolster a listener's interpretation that the allegations relayed by defendant are assertions of fact. Defendant republishes allegations that explicate assertions of fact about plaintiff's involvement in Ms. Levy's disappearance. As such, defendant statements on *The Laura Ingraham Show* properly substantiate a claim for slander.

Defendant gives essentially three reasons why the statements do not constitute false assertions of fact. None of these reasons, however, support dismissal of the complaint with respect to the statements made on *The Laura Ingraham Show*.

### i. *Context*

First, defendant argues that the broad and specific contexts in which the statements were published negates any factual connotation the statements may have had. With respect to the broad context of the statements, defendant argues that he merely published surmises about a matter that captured nationwide attention and sparked a media frenzy. Defendant characterizes the subject of the media frenzy as a debate over plaintiff's involvement in Ms. Levy's disappearance, and explains that he merely added his voice to the debate. Because speculation about plaintiff channeled through the national media was overflowing at the time, defendant contends that any listener would perceive his comments as subjective opinion. With respect to the specific context of defendant's comments on *The Laura Ingraham Show*, defendant emphasizes that the forum is a radio talk show. Listeners understand that guests such as defendant offer their views on the show rather than facts, according to defendant.

Defendant's first argument is not without merit. Ms. Levy's disappearance drew national attention. The eligible submissions of the parties make clear that while Ms. Levy's disappearance was under investigation, press dedicated to the mystery was short on facts and long on conjecture. Because defendant appeared on *The Laura Ingraham Show* on the heels of the media frenzy, the broad context of the statements suggests that listeners and readers would regard his statements with skepticism. Moreover, because defendant's statements were published on a talk show, they are distinguishable from much of the body of successfully pleaded slander claims, which involve statements made in

news publications. *See, e.g., Celle,* 209 F.3d 163 (upholding judgment for plaintiff based on statements made in newspaper); *Weller,* 232 Cal.App.3d 991, 283 Cal.Rptr. 644 (upholding claims based on statements made during news broadcast). As is clear simply from the transcript and audio recording submitted with the moving papers, listeners seeking the facts likely do not tune in to *The Laura Ingraham Show.* Defendant, however, is not immunized from a defamation suit simply because he recited false accusations on a talk show as opposed to a news program. *Cf. Brian v. Richardson,* 87 N.Y.2d 46, 53, 637 N.Y.S.2d 347, 660 N.E.2d 1126, 1131 (1995) (noting that the statement's publication on the Op Ed page of the New York Times "does not automatically insulate the author from liability for defamation"). Here, a reasonable listener, aware of the media frenzy and cognizant of the apparent nature of *The Laura Ingraham Show,* nonetheless could interpret defendant's comments as assertions of fact, because the comments themselves set forth specific, detailed bases for the accusation that plaintiff was criminally involved in Ms. Levy's disappearance. While the setting for defendant's comments would suggest that he merely voiced his opinion, the suggestion is overcome by the content of defendant's statements, because the statements can be interpreted as explicit republications of actual, detailed facts.

ii. *Republication*

Second, defendant argues that he merely disclosed allegations that the horse whisperer revealed to him, then offered speculation about plaintiff based on the allegations. According to defendant, "A statement of opinion that is accompanied by a recitation of the facts upon which it is based and where the speaker or writer does not imply the existence of other, undisclosed facts can not [sic] serve as the basis for a defamation action." (Defen-

dant's Memo, at 26.) By telling the horse whisperer's story, defendant contends, he merely relayed allegations of another, which the audience could take for what they are worth.

■ Defendant's argument rests on a misstatement of the law of defamation. First, a speaker who republishes the accusations of others is not immune from a defamation action. *Ringler,* 80 Cal.App. 4th at 1180, 96 Cal.Rptr.2d 136 ("Reprinting or recirculating a libelous writing has the same effect as the original publication."); *Flowers v. Carville,* 310 F.3d 1118, 1128 (9th Cir.2002) (relying on "the venerable principle that a person who repeats a defamatory statement is generally as liable as the one who first utters") (collecting authorities). The reason for this rule is that republication of false facts threatens the target's reputation as much as does the original publication. *See Flowers,* 310 F.3d at 1128. The republisher, moreover, may be liable for republishing the false statements of others even if the republisher discloses the identity of the source of the statements. *Flowers,* 310 F.3d at 1128 (" 'Every repetition of the defamation is a publication in itself, even though the repeater states the source, or resorts to the customary newspaper evasion "it is alleged." ' " (quoting *Prosser and Keeton on the Law of Torts* § 113, at 799 (5th ed.1984))); *Cianci v. New Times Publishing Co.,* 639 F.2d 54, 60–61 (2d Cir.1980) (Friendly, J.) (relying on the "widely recognized" "black-letter rule that one who republishes a libel is subject to liability just as if he had published it originally, even though he attributes the libelous statement to the original publisher, and even though he expressly disavows the truth of the statement" (internal quotations omitted)).

■ Defendant also states incompletely the law on publication of opinions ac-

companied by full disclosure of the facts on which they are based. Defendant is correct that "when an author outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment." *Partington*, 56 F.3d at 1157. This principle "assumes, however, that the factual basis itself is true." *Flowers*, 310 F.3d at 1129; *Standing Committee v. Yagman*, 55 F.3d 1430, 1440 (9th Cir.1995) ("Where a publication sets forth the facts underlying its statement of opinion and those facts are true, the Constitution protects that opinion from liability for defamation." (internal quotations and alterations omitted)); *Dodds*, 145 F.3d at 1067 (noting that opinions based on disclosed facts are not actionable "where the underlying facts are not actionable because they are nondefamatory" and "where [the underlying facts] are not actionable because there is an absence of actual malice"); *Franklin*, 10 Cal. Rptr.3d at 438. A speaker, therefore, properly finds protection in the First Amendment when he publishes opinions based either upon fully disclosed, true facts, *see, e.g., Partington*, 56 F.3d at 1154 ("Where, as here, an author writing about a controversial occurrence fairly describes the general events involved and offers his own personal perspective about some of its ambiguities and disputed facts, his statements should generally be protected by the First Amendment."), or upon facts otherwise commonly known to the audience, such as facts that are a matter of public knowledge. *See, e.g., Cochran*, 58 F.Supp.2d at 1122 (dismissing Johnnie Cochran, Esq.'s suit against the *New York Post*, because the statement "history reveals that [Cochran] will say or do just about anything to win, typically at the expense of truth" was based upon disclosed facts, and not "on any additional, undisclosed facts not known to the public"); *Goetz v. Kunstler*, 164 Misc.2d 557, 563, 625 N.Y.S.2d 447 (N.Y.Sup.Ct.1995) (dismissing complaint of Bernhard Goetz against William Kunstler, Esq., in part because Mr. Kunstler's "description of Goetz as a 'murderous vigilante' would be understood as an opinion, a mere hypothesis based upon facts both widely known and fully set forth"). A speaker does not necessarily find protection in the First Amendment, however, when he publishes opinions based on disclosed facts which are themselves false.

Here, defendant's statements on *The Laura Ingraham Show* fall into essentially two categories, namely, disclosed facts, and speculation based on those facts. Statements such as "He said that she was put in a limousine, and this procurer claims that he saw her being put on a plane, one of these big commercial-sized private planes that the Arabs have, rich princes, and those people.... And he said, let me put it this way. She wasn't walking," (Compl., ¶ 20, at 10.), exemplify the former category. Statements such as "And therefore, he can, he can pass any lie detector test because he specifically does not, I mean, he does not know rather, what specifically happened," (Compl., ¶ 20, at 18.), exemplify the latter category.

Neither type of statement is immune from a slander suit. The facts disclosed by the defendant are republications of falsities. These statements, in fact, are literally true because defendant clarifies that he is merely retelling stories told to him. But the stories themselves are false and defamatory, and defendant, the republisher, poses no less threat to plaintiff's reputation than does the horse whisperer and the procurer, the original publishers. It is here that defendant's argument that the listener is free to take his statements for what they are worth misses the mark. For example, had the horse whisperer in-

stead appeared on *The Laura Ingraham Show*, the horse whisperer likely would be subject to a defamation action. Hearing the horse whisperer, the listener would of course be free to take his statements for what they are worth, as his identity and demeanor would be disclosed. But the horse whisperer would be subject to suit because he published false statements of fact. The substance of the analysis remains when applied to defendant, the republisher. Because defendant disclosed information about his sources and the facts underlying his opinions, the listener was free to take defendant's statements for what they were worth. But defendant, according to the complaint, republished false statements of fact. The potentially tortious act in either case is the publication of a false assertion of fact, and this is not unconditionally protected by the First Amendment. Defendant therefore is not immune from suit.

This case resembles *Flowers v. Carville*, 310 F.3d 1118 (Kozinski, J.). In that case, Gennifer Flowers sued James Carville, George Stephanopoulos, and Hillary Clinton for defamation, based upon statements made by each defendant after Flowers publicly played audio tapes of intimate conversations between herself and then presidential candidate Bill Clinton. The

lower court, applying Nevada law, dismissed the case against Carville and Stephanopoulos because their publications merely referred to a CNN investigation that Flowers had edited the audio tapes, then gave opinions based on this revelation. *See id.* at 1127. The Ninth Circuit reversed the lower court. The Ninth Circuit noted that defendants' position "has some intuitive appeal," because defendants' statements such as " 'An expert on KCBS said that the tapes had been edited to enhance Flowers's credibility' may be literally true, even if the KCBS expert is wrong." *Id.* at 1128. The Ninth Circuit rejected defendants' position, however, because "the truth of the news reports on which defendants claim to have relied is disputed." *Id.* at 1129. Defendants republished allegedly false statements, and their accurate references to news reports did not excuse them from suit. *Id.* at 1128. In the present case, defendant likewise referenced the allegations of others, and likewise finds no protection from suit as a mere republisher.[4]

The second type of comments made by defendant, the speculations and opinions based upon the disclosed facts, thus find no special protection. These statements must not be observed in isolation, but rather in light of the facts on which they are

---

**4.** The *Flowers* case offers a closer analogue to the present case than does *Levin v. McPhee*, 119 F.3d 189 (2d Cir.1997), on which defendant relies. In *Levin*, the Court applied New York's more stringent protection for opinions. The defendant in *Levin*, author John McPhee, presented simultaneously in a book five versions of a mysterious studio fire that caused the death of Evgeny Rukhin, an artist. *Id.* at 192. The versions "recount interviews McPhee had with five people who knew Rukhin but were not at the scene of the fire.... [E]ach of the five tells McPhee what each believed and/or heard to be the facts concerning Rukhin's death." *Id.* Two of the versions are imagined, and, unlike the current case, none are given under the pretense that the

original publisher, or the republisher, are privy to facts that later turn out to be false. In other words, the case in *Levin* was dismissed because the statements at issue were guesses made on the basis of known facts and suspicions. The statements are attempts to solve an acknowledged mystery. In the current case, the statements at issue are republications of assertions of fact told originally by a person claiming to know these "facts" firsthand. The statements pose as the mystery's actual solution. In *Levin*, therefore, unlike here, the simultaneous publication of five conflicting versions negated the factual connotation of each version, as did the clear gap between disclosed facts and remote theories based only on guesswork.

based. Here, defendant does not base his speculation about plaintiff's role in Ms. Levy's disappearance on true, disclosed facts, or on true facts otherwise known to the public. Defendant rather bases his speculation upon false allegations that he disclosed to the listeners. Even the fragments of defendant's statements properly categorized as speculation and opinion, therefore, are not immune from suit.

Defendant's second argument, then, that his statements on *The Laura Ingraham Show* are not actionable because they constitute mere opinions based on disclosed facts, is incorrect. Because defendant republished false statements of fact, defendant is not exempt from plaintiff's slander claim.

### iii. *Signals*

Defendant's third argument is that he gave signals during the interview on *The Laura Ingraham Show* to make clear that he merely offered speculation and opinions in his commentary. Defendant, for example, said "I can't vouch for any of this," "if he indeed is involved," and "if it indeed is true that [plaintiff] is a welcome guest at Middle Eastern embassies." Defendant, in other words, qualified his statements to indicate that he did not know whether the allegations of the horse whisperer were true, and now argues that this should exempt him from liability.

Defendant's argument is belied by the facts and the law. First, defendant does appear to "vouch" for the statements at times during the interview. Defendant describes the horse whisperer as someone known the "world over," and agrees that he is "a respectable individual." Defendant also engages in a discussion with Ingraham in which the two agree that the allegations make "beautiful sense." Additionally, while the Court disagrees with plaintiff's suggestion that the mere repub-

lication of the horse whisperer's story represents defendant's endorsement of the story, the Court notes that the tone of defendant's exchange with Ingraham appears an attempt to lend credit to the story. Defendant's partial efforts to distance himself from the allegations do not merit the dismissal of plaintiff's action. *Cf. Weller*, 283 Cal.Rptr. at 652 ("[T]he implied defamatory facts in this context may be given even more credence by the listener where, as here, the reports profess to be objective, yet subtly imply that the publisher tends to believe the sources alleging the defamatory facts.").

Moreover, the law does not support defendant's argument. Statements that constitute false assertions of fact are no less defamatory simply because they are preceded by qualifying expressions. *Cf., e.g., Cianci*, 639 F.2d at 64 (Friendly, J.) ("It would be destructive of the law of libel if a writer could escape liability for accusations of crime simply by using, explicitly or implicitly, the words 'I think.' "). Moreover, defendant did not use hyperbolic or figurative language in his interview, and thus falls outside of the protections outlined by the *Greenbelt, Falwell, Letter Carriers* line of cases. Finally, as discussed below, to the extent defendant's emphasis on phrases like "I can't vouch for any of this" calls upon the doctrine of neutral reportage, this emphasis is misplaced, because the doctrine of neutral reportage is inapplicable.

In sum, the Court finds that, considering a totality of the circumstances, defendant's statements on *The Laura Ingraham Show* constitute false assertions of fact. These statements enjoy no special First Amendment immunity from plaintiff's action for slander. Defendant's motion to dismiss plaintiff's claims with respect to the statements made on *The Laura Ingraham Show* is denied.[5]

---

**5.** As defendant's motion to dismiss is partially denied, the Court need not address plaintiff's

## 2. *Entertainment Tonight Online*

■ The parties take familiar positions with respect to the brief quotations of defendant published in *Entertainment Tonight Online* ("*ET Online*") on January 18, 2002. Defendant argues that the context of the publication, namely, an internet celebrity gossip column, indicates that defendant's statements quoted therein are not to be taken as fact. Plaintiff responds that defendant made accusations based on undisclosed facts in the *ET Online* column, and thus that the statements were not simply opinions.

Defendant's statements published in the *ET Online* column can be reasonably interpreted as assertions of fact. *ET Online* quotes defendant as stating that "Gary Condit rides with The Hell's Angels as a motorcyclist," and repeats defendant's original "theory" that Ms. Levy was taken away on the back of a motorcycle as a favor to plaintiff. *ET Online* also quotes defendant as stating that a man in Hamburg, Germany had called him and said to defendant " 'that's not how it happened!'— and that he knew how it happened!" *ET Online* then reports that "with the investigation still pending, Dunne could not reveal any more information."

These statements sustain a defamation claim. Defendant's statement that plaintiff "rides with The Hell's Angels" is not necessarily defamatory by itself, but is potentially defamatory when coupled with defendant's allegations that such involvement led to plaintiff's criminal involvement in Ms. Levy's disappearance. Plaintiff claims that this "fact" is false. Defendant's theory that Ms. Levy was taken away as a favor to plaintiff is based on this false assertion of fact. As for the abbreviated rendition of the horse whisperer story, defendant's statements imply knowledge of undisclosed facts, namely, that the truth behind Ms. Levy's disappearance is known to defendant and is under investigation by "authorities." The statements in the *ET Online* column collectively assert and imply false assertions of fact. Moreover, the statements are not protected by the First Amendment simply because they appeared in a gossip column. While the context of allegedly defamatory statements influences the impact of the statements on the audience, no context gives free reign to a commentator to publish false facts as if they are true. Defendant's motion to dismiss plaintiff's claims with respect to the statements made on *ET Online* is denied.

## 3. *Larry King Live*

■ Defendant's statements on *Larry King Live* on February 13, 2002, are also actionable, as the constitute false assertions of fact that defame plaintiff by implication. Defendant tells an abbreviated version of the horse whisperer story. Defendant states "I can't authenticate all of this," then states "I believe firmly that he knows more than what he has ever said." Were the Court to parse out the statements clause by clause, it perhaps could imagine that each is innocuous. *See Church of Scientology v. Flynn,* 744 F.2d 694, 696 (9th Cir.1984) (noting that "the court must refrain from a 'hair-splitting' analysis of what is said in an article to find an innocent meaning" at the pleadings stage). But properly read together, defendant's statements on *Larry King Live* constitute republications of false assertions of fact, namely that an animal behaviorist had been in Washington the day of the Ms. Levy's disappearance, and that he knew how she was kidnapped, and an opinion based upon those disclosed and nondis-

application, made only in his reply brief, for fees based upon California's Anti–SLAPP statute. *See* Cal.Civ.Proc.Code § 425.16; *Thom-* *as v. Los Angeles Times Communications, LLC,* 189 F.Supp.2d 1005, 1010 (C.D.Cal.2002).

closed false facts, namely, that plaintiff was criminally involved in the disappearance of Ms. Levy. Defendant's emphasis on his statement "I can't authenticate any of this" and his characterization of his statements as "theory" meet the same legal obstacles discussed above. Simply put, the First Amendment does not absolutely protect a speaker who republishes false assertions of fact, then disclaims any awareness of the actual truth of the republication, then "theorizes" that the defamatory implication of the republication is true. Defendant's motion to dismiss plaintiff's claims with respect to the statements made on *Larry King Live* is denied.

### 4. *The Dinner Parties*

Plaintiff does not include in his complaint any statements made at the dinner parties in New York and California. Plaintiff alleges only that defendant "repeated the slanderous statements uttered on *The Laura Ingraham Show*." Defendant argues that because these claims do not set forth specific statements they must be dismissed. Defendant also argues that pleading requirements are more stringent in defamation cases when the plaintiff is a public figure because of the First Amendment concerns attendant upon such cases. Defendant relies on, among other things, *Herbert v. Lando*, 603 F.Supp. 983, 989–90 (S.D.N.Y.1985), in which Judge Charles S. Haight ruled that requiring a public figure plaintiff to include the exact words in the complaint "is not asking too much." Defendant also argues that by failing to include any specific statements in the complaint, plaintiff cannot show that he was slandered *per se*, and plaintiff cannot alternatively show that he suffered special damages. Plaintiff responds that the allegations related to the dinner parties meet the pleading standards of Rule 8 of the Federal Rules of Civil Procedure, and thus should not be denied. Plaintiff relies on, among other things *Albin v. Cosmetics*

*Plus N.Y., Ltd.*, No. 97 Civ. 2670, 1997 WL 615494, at *3 (S.D.N.Y. Oct.6, 1997), in which Judge Whitman Knapp ruled that the complaint met Rule 8's liberal pleading standards even though plaintiff did not include the exact allegedly defamatory words.

Pleadings in federal diversity cases are governed by the Federal Rules of Civil Procedure. *Kelly v. Schmidberger*, 806 F.2d 44, 46 (2d Cir.1986). "The test of a complaint's sufficiency is whether it is detailed and informative enough 'to enable defendant to respond and to raise the defense of res judicata if appropriate.'" *Id.* (quoting *Geisler v. Petrocelli*, 616 F.2d 636, 640 (2d Cir.1980)). In defamation actions, the complaint need only give defendant sufficient notice of the words at issue to allow defendant to defend himself. *Id.; Kirkland v. Local 32B/32J, Int'l Serv. Workers Union*, No. 90 Civ. 2238, 1990 WL 213046, at *2 (S.D.N.Y. Dec.11, 1990). A complaint, therefore, need not necessarily state the exact words alleged to be defamatory to overcome a motion to dismiss.

Here, plaintiff sufficiently identifies the defamatory statements in his complaint. Plaintiff identifies the dinner parties' dates, locations, hosts, and number of guests. (Compl., ¶¶ 28–29, 31–32.) The complaint also names some of the guests at the dinner parties. More importantly, the complaint specifies that defendant "repeated the slanderous statements uttered on *The Laura Ingraham Show*." This allegation gives defendant sufficient notice of the words at issue with respect to the dinner parties, because the exact words spoken on *The Laura Ingraham Show* are set forth in their entirety in the complaint. In *Herbert v. Lando*, by contrast, the Court gave no indication that plaintiff had specified exact words elsewhere in the complaint. Moreover, the Court there

noted that plaintiff should have had no trouble including the exact words in the complaint because the action was based on statements made in a television news program. *See Herbert,* 603 F.Supp. at 989. Defendant's complaint differs from that in *Herbert,* because the substance of the statements made at the dinner parties are set forth elsewhere in the complaint. Thus party-goers need not prepare for defendant's ominous forecast that permitting plaintiff to proceed will "put all dinner table conversation at risk of such suits, casting a pall on such social discourse." Nor is the Court persuaded by defendant's argument for applying heightened pleading requirements to plaintiff because he is a public official. Although "[t]he First Amendment is not irrelevant at the pleading stage," *Flowers,* 310 F.3d at 1130, it does not require plaintiff to do more than enable defendant to respond to the complaint. Here plaintiff has done so, and the Court declines to dismiss plaintiff's claims at this early stage for failure to allege the exact words spoken at the dinner parties.

Finally, as plaintiff alleges that defendant repeated the statements he uttered on *The Laura Ingraham Show* at the dinner parties, plaintiff overcomes defendant's constitutional arguments as discussed above. Should the course of this litigation reveal that defendant's statements at the dinner parties were not merely substantive repetitions of defendant's broadcasted statements, the Court will address the issue with the parties at that time. At this time, defendant's motion to dismiss plaintiff's claims with respect to the dinner parties is denied.

### 5. *The Boston Herald*

█ Defendant's comments that appeared in the *Boston Herald* on May 24, 2002, do not declare or imply false assertions of fact. By the time of publication, Ms. Levy's remains had been found in Washington, D.C. The article quotes defendant as continuing to believe that plaintiff was criminally involved in Ms. Levy's disappearance. It states that defendant "still believes Washington intern Chandra Levy was the victim of foul play and the discovery of her body doesn't let Congressman Gary Condit off the hook." The article continues to quote defendant as saying, "[Plaintiff is] one of the great (bleeps)." (second alteration in original) The article then mentions each of defendant's theories about plaintiff's possible involvement in Ms. Levy's death, noting that the discovery of Ms. Levy's body "would seem to rule out" the horse whisperer story.

Defendant's statements published in the article are speculation based on information generally known to the public. Defendant does not imply that he is aware of any undisclosed facts that would lend a factual connotation to his speculation. Defendant does not republish any allegations that constitute false assertions of fact. Rather, defendant simply offers his take on information shared among the general reading audience, namely, that plaintiff and Ms. Levy were acquainted, (Compl.¶ 15.), and that Ms. Levy had disappeared and died in Washington, D.C. (Compl.¶¶ 13, 34.) The horse whisperer story set forth during *The Laura Ingraham Show* was essentially disproved by the recovery of Ms. Levy's remains in Washington, D.C., and thus it is not asserted as the factual basis on which defendant bases his speculation about plaintiff in the *Boston Herald* article. The article's mention of the motorcycle theory likewise does not imply that defendant bases his opinions on any information not disclosed. Additionally, plaintiff's point that defendant "did not let Plaintiff Condit off the hook," while seemingly a fair description of defendant's comments, is inapposite. Defendant need not have "let plaintiff off the hook" to gain the protection of the First Amendment for his opinions. Rather, be-

cause defendant based his opinions on information uncontroverted in the complaint and known to the public, his statements do not sustain a slander action. Defendant's motion to dismiss plaintiff's claims with respect to the *Boston Herald* publication is granted.

### 6. *USA Today*

■ As with the *Boston Herald* comments, defendant's comments that appeared in *USA Today* on June 19, 2002, do not declare or imply false assertions of fact. The article mentions the horse whisperer story, concluding that defendant "thinks he was hoodwinked" by the source. The article then quotes defendant as follows: "I don't think he killed her. I think he could have known it was going to happen." Plaintiff argues that the mention of the horse whisperer story and the accusation of criminality would cause the average reader to assume that defendant's opinion was based on undisclosed information. The Court disagrees. The article does not set forth any details of the horse whisperer story, and makes clear that the story is not true. Defendant's opinion is only based upon information generally known to the public. The First Amendment protects defendant's opinion in *USA Today* that plaintiff was involved in Ms. Levy's disappearance, regardless of its accuracy, because it is not based upon implied undisclosed information or expressed false assertions of fact. *See Goetz*, 164 Misc.2d at 560, 625 N.Y.S.2d 447. Defendant's motion to dismiss plaintiff's claims with respect to *USA Today* is granted.

### C. The Doctrine of Neutral Reportage Does Not Apply to Defendant's Statements

■ The doctrine of neutral reportage does not privilege any of defendant's com-

ments. Defendant does not appeal to the doctrine by name. Defendant's arguments, however, appeal to the substance of the doctrine, and the Court here reviews the applicability, or lack of applicability, of the doctrine for the sake of fairness and completeness.[6]

In *Edwards v. National Audubon Society*, Judge Kaufman first recognized a "fundamental principle" that "when a responsible, prominent organization . . . makes serious charges against a public figure, the First Amendment protects the accurate and disinterested reporting of those charges, regardless of the reporter's private views regarding their validity." 556 F.2d 113, 120 (1977). The reason for this protection is that "[t]he public interest in being fully informed about controversies that often rage around sensitive issue demands that the press be afforded the freedom to report such charges without assuming responsibility for them." *Id.* Among the elements of the neutral reportage privilege set forth in *Edwards* are that the accusations must be made by a respectable individual or organization, the target must be a public figure, the reporter must convey the accusations accurately, and the reporter must be neutral, i.e., he must not "espouse[ ] or concur[ ] in the charges made by others." *Id.*

The neutral reportage doctrine set forth in *Edwards* has neither been widely adopted nor rejected. The Supreme Court and California, specifically, have not decided whether the doctrine comports with the United States Constitution or with California law. *See Harte–Hanks Communications v. Connaughton*, 491 U.S. 657, 660 n. 1, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989); *Khawar v. Globe Intern. Inc.*, 19 Cal.4th 254, 79 Cal.Rptr.2d 178, 187, 965 P.2d 696 (1998). Courts considering the doctrine

---

**6.** Defendant quotes, for example, *Edwards v. National Audubon Society, Inc.*, and argues that "[t]he horsewhisperer story was in itself newsworthy." (Defendant's Memo, at 29.)

also have debated whether the doctrine applies when the accusations are not made by a respectable organization, *see Barry v. Time,* 584 F.Supp. 1110, 1126–27 (N.D.Cal. 1984) (questioning whether the source of the allegations must be trustworthy, and extending neutral reportage privilege to "all republications of serious charges made by one participant in an existing public controversy against another participant in that controversy"), and whether the doctrine applies when the target is not a public figure. *See Khawar,* 79 Cal.Rptr.2d at 188–90, 965 P.2d 696 (ultimately rejecting argument that doctrine of neutral reportage should apply to protect statements about private figures).

The uncertainty of the doctrine's status in the law and the contours of its elements, however, causes the Court no pause, because defendant's statements fail to satisfy the "critical" neutrality element of the neutral reportage doctrine. *See Barry,* 584 F.Supp. at 1127 ("[*I* ]*t is the neutrality of the report* which is critical."). Defendant's comments in each medium were not neutral. Defendant concurred in the allegations he reported, making clear in each publication that he believed that plaintiff was criminally involved in Ms. Levy's disappearance. *See Flowers,* 310 F.3d at 1128 n. 5 (declining to apply the neutral reportage privilege because defendants' statements were not neutral); *Cianci,* 639 F.2d at 68–69 (declining to apply the neutral reportage, because the speaker's neutrality presents an issue for the jury). Defendant likely confronts other obstacles to the application of the neutral reportage doctrine, because the horse whisperer's allegations arguably were not newsworthy themselves. *Cf. Edwards,* 556 F.2d at 120 ("What is newsworthy about such accusations is that they were made."); *see also* Justin H. Wertman, Note, *The Newsworthiness Requirement of the Privilege of Neutral Reportage,* 65 Fordham L.Rev. 789, 790, 822 (1996) (suggesting that the

neutral reportage privilege does not encompass accusations that are not a matter of public concern). But the Court need not address this issue in any event, because none of defendant's "reportage" was neutral. Accordingly, the doctrine of neutral reportage does not apply in this case, and the Court declines to grant defendant's motion to dismiss based on this doctrine.

D. *Denying Defendant's Motion Comports with the Principles of the First Amendment*

Denying in part defendant's motion comports with the First Amendment's "vital guarantee of free and uninhibited discussion of public issues." *Milkovich,* 497 U.S. at 22, 110 S.Ct. 2695. Mindful of this vital guarantee, courts properly apply the most rigorous possible constitutional analysis to defamation actions brought against speakers who comment on public controversies. The mere initiation of such actions causes a chilling effect that threatens to undermine the First Amendment's protection of speech on public controversies. *See Flowers,* 310 F.3d at 1130; *Partington,* 56 F.3d at 1159 ("If [authors] are not granted leeway in interpreting ambiguous events and actions, the public dialogue that is so important to the survival of our democracy will be stifled."); *Barry,* 584 F.Supp. at 1124 n. 16 ("Recognition of the public's 'right to know' that serious charges have been made against a public figure is an important application of the Supreme Court's concern that 'debate on public issues be uninhibited, robust, and wide-open.'" (quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964))). Moreover, the success of any such action necessarily reflects a mistrust of the free marketplace of ideas. *See Abrams v. United States,* 250 U.S. 616, 630, 40 S.Ct. 17, 63 L.Ed. 1173 (1919) (Holmes, J., dissenting); *Milkovich,*

497 U.S. at 18, 110 S.Ct. 2695; *Cianci*, 639 F.2d at 61. The First Amendment presumes that "the best test of truth is the power of the thought to get itself accepted in the competition of the market," and thus that the targets of falsehoods find better recourse in the "free trade of ideas" than in the tort system. *Abrams*, 250 U.S. at 630, 40 S.Ct. 17 (Holmes, J., dissenting).

Several protections, therefore, apply for the benefit of speakers who comment on matters of public controversy. Foremost among these protections is the additional requirement that a public official must prove that the defendant spoke with actual malice. *Sullivan*, 376 U.S. at 279–80, 84 S.Ct. 710; *see Cianci*, 639 F.2d at 70 (Friendly, J.) (emphasizing limitation of its holding that the statements are not immunized as opinions or neutral reportage, and reminding that the ruling "in no way relieves the plaintiff from the heavy burden imposed by *New York Times Co. v. Sullivan*"). A public official must prove actual malice with convincing clarity. *See Planned Parenthood v. American Coalition of Life Activists*, 290 F.3d 1058, 1067 (9th Cir.2002); *Cianci*, 639 F.2d at 59. Additionally, when the target of the speech is a public official, the burden of proving falsity rests on the plaintiff. *See Milkovich*, 497 U.S. at 16, 110 S.Ct. 2695 (citing *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986)); *Smith v. Maldonado*, 72 Cal.App.4th 637, 85 Cal.Rptr.2d 397, 403 n. 5 (1999). Finally, in the Ninth Circuit, a speaker who comments on a public official's fitness for office is absolutely immune from suit. *See Dodds*, 145 F.3d at 1067.

Here, denying in part defendant's motion for dismissal vitiates none of these additional requirements, several of which likely apply in this case. Defendant spoke about a matter of public controversy, namely, the disappearance of Ms. Levy.

The target of defendant's statements is a public official, who suffers the heaviest possible burden for a plaintiff in a defamation action. This decision softens none of these additional requirements in this case. Defendant, however, did not merely comment on a public controversy, but also added false assertions of fact to the public controversy. The vital guarantee of uninhibited discussion does not necessarily encompass the republication of detailed, false, accusations of criminality with which the republisher thereafter concurs. The Court's decision, in other words, reflects no lack of confidence that the truth of defendant's statements was best tested by the competitive marketplace of ideas. Rather, the Court's decision merely applies the law to determine whether defendant was entitled to enter his comments in the marketplace without fear of redress. Denying in part defendant's motion to dismiss, the Court merely rules that plaintiff has made out a claim for slander, because defendant's statements on *The Laura Ingraham Show*, *ET Online*, and *Larry King Live* and at dinner parties constitute false assertions of fact, and thus are owed no special immunity under the First Amendment.

## Conclusion

For the reasons set forth above, the Court denies in part and grants in part defendant's motion to dismiss the complaint. The Court denies defendant's motion with respect to plaintiff's claims based upon the statements made on *The Laura Ingraham Show*, *ET Online*, and *Larry King Live*, and those made at the dinner parties. The Court grants defendant's motion with respect to plaintiff's claims based upon the statements made in the *Boston Herald* and *USA Today*. The claims based on those publications are dismissed because they do not constitute or imply false assertions of fact. The parties

are ordered to appear for a status conference on June 10, 2004, at 10:30 a.m.

SO ORDERED.